**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

HELEN LOPEZ, as Personal Representative of
Wrongful Death Estate of JIM CLARK,
Deceased,

    Plaintiff,

vs.                No. CIV 11-0227 JB/GBW

AMERICAN BALER COMPANY, a foreign corporation;
METSO CORPORATION, a foreign corporation;
METSO LINDEMANN, a foreign corporation;
LINDEMANN RECYCLING EQUIPMENT, INC.,
a foreign corporation; DON DICKASON and
MARTHA DICKASON, individually and
d/b/a dmDICKASON PERSONNEL SERVICES,

    Defendants,

and

LINDEMANN RECYCLING EQUIPMENT, INC.,

    Defendant/Third-Party Plaintiff,

vs.

CITY OF LAS CRUCES,

    Third-Party Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

   **THIS MATTER** comes before the Court on Defendants Don Dickason, Martha Dickason

and dmDickason Personnel Services' Motion for Summary Judgment and Memorandum in

Support Thereof, filed August 28, 2013 (Doc. 80)("MSJ").  The primary issue is whether the

exclusive-remedy provisions of the New Mexico Workers' Compensation Act, N.M. Stat. Ann.

§§ 52-1-1 to -70 ("NMWCA"), preclude Plaintiff Helen Lopez, as the personal representative of

the wrongful death estate of Jim Clark, from bringing a breach-of-contract claim against the Defendants Don Dickason and Martha Dickason, individually and doing business as *dm*Dickason Personnel Services (collectively "the Dickason Defendants") for failing to provide a safe work place.   The Court will grant the MSJ, because the NMWCA "provides exclusive remedies," N.M. Stat. Ann. § 52-1-6(E), and a breach-of-contract claim based on an implied contract for the failure to provide a safe workplace circumvents the NMWCA's purpose.

## FACTUAL BACKGROUND

On November 16, 2007, Jim Clark, a *dm*Dickason Personnel employee, was working at the City of Las Cruces, New Mexico, Recycling Center.   See Payroll History Report at 1, filed August 28, 2013 (Doc. 80-1); Workers Compensation - First Report of Injury or Illness at 1, filed August 28, 2013 (Doc. 80-2)("First Injury Report"); MSJ ¶ 1, at 2 (setting forth this fact); Plaintiff's Response to Defendants Don Dickason Martha Dickason and dmDickason Personnel Services Motion for Summary Judgment and Memorandum in Support Thereof ¶ 1, at 3, filed September 23, 2013 (Doc. 83)("Response")(not disputing this fact).[1]   Sometime during the day, the Lindemann Baler -- a machine used for baling recycled materials -- jammed, and J. Clark

_____

[1]   In the Response, Lopez argues that the MSJ "should be denied because there are genuine issues of material fact" and then sets forth "additional material facts."   Response at 3. D.N.M.LR-Civ. 56.1(b) states:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.   Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.   All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56. 1(b).   The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact or else the fact is deemed admitted.   D.N.M.LR-Civ. 56.1(b).   Because Lopez has not specifically controverted the Dickason Defendants' asserted facts, the Court will deem them undisputed.

entered the baler to unjam it.   See First Injury Report at 1; Complaint for Wrongful Death, Negligence, Personal Injuries and Damages, Infliction of Emotional Distress Due to Negligence, and Products Liability ¶¶ 10-11, at 3, filed in state court November 3, 2010, filed in federal court March 14, 2011 (Doc. 1-1)("Complaint"); MSJ at 2; Response at 1-2.[2]  While inside, the baler reengaged and fatally injured J. Clark.   See First Injury Report at 1; Complaint ¶ 11, at 3; MSJ at 2.[3]

No other *dm*Dickason Personnel employees were present at the Recycling Center or instructed J. Clark to enter the baler on November 16, 2007.   See Deposition of Apolinar Garcia 126:13-16 (Maestas, Garcia), taken March 5, 2013, filed August 28, 2013 (Doc. 80-3), filed September 23, 2013 (Doc. 83-4)("Garcia Depo.");[4] id. at 128:24-129:23 (Maestas, Garcia); Deposition of Max Gonzalez at 118:5-22 (Maestas, Gonzalez), taken March 6, 2013, filed August 28, 2013 (Doc. 80-4)("Gonzalez Depo."); MSJ ¶¶ 3-4, at 3 (setting forth this fact); Response at 3 (not disputing this fact).   At least two City of Las Cruces employees were present -- Bonnie Tafoya, a supervisor[5] at the Recycling Center, and Apolinar Garcia, who was operating the baler at the time of J. Clark's accident.   See Garcia Depo. at 30:7-19 (Jamieson; Garcia); id. at

---

[2] Although neither Lopez nor the Dickason Defendants set forth this fact as one of their undisputed facts, they described this event in the introductory paragraphs, and the Court is including it to explain the events giving rise to the litigation.

[3] Although neither Lopez nor the Dickason Defendants set forth this fact as one of their undisputed facts, the Court is including it to explain the events giving rise to the litigation.

[4] The Dickason Defendants and Lopez filed portions of the Garcia Depo. as evidence; the Court will refer to both portions as the Garcia Depo., because the numbering system that appears on the deposition transcript is consistent between the portions provided to the Court.

[5] Lopez asserts that Tafoya was a manager at the Recycling Center, see Response ¶ 6, at 3, and cites as evidence the "Dickason Undisputed Material Facts No. 2," which states that Clark "worked under the supervision of Bonnie Tafoya," MSJ ¶ 2, at 2.  While Tafoya may be a manager, the evidence identifies her more generally as a supervisor.

121:16-122:9 (Maestas, Garcia); id. at 132:9-19 (Maestas, Garcia); MSJ ¶¶ 5-7, at 3 (setting forth this fact); Response at 3 (not disputing this fact).

      J. Clark had worked for *dm*Dickason Personnel since early January, 2007.  See Payroll History Report at 1; Response ¶ 1, at 3 (setting forth this fact).[6]  When J. Clark was hired, *dm*Dickason Personnel had a Policies and Procedures Handbook that it provided to J. Clark, which J. Clark had in the hotel room where he was living at the time of his death.[7]  See Deposition of

---

[6] The Dickason Defendants state that Lopez' additional material facts "are, in fact, immaterial to Dickason's summary judgment motion."  Defendants Don Dickason, Martha Dickason and dmDickason Personnel Services' Reply to Plaintiff's Response to Defendants Don Dickason, Martha Dickason and dmDickason's Motion for Summary Judgment and Memorandum in Support Thereof at 3, filed October 16, 2013 (Doc. 87)("Dickason Reply").

> The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court explained that, because the proper course is to determine relevance of facts in the analysis section, rather than in the factual background section, objecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.  See 883 F. Supp. 2d at 1058 n.1.  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1276-79 (D.N.M. 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address [the cited case] at this time, but will consider it in its legal analysis.").  The Court thus deems these facts admitted and will, as necessary, determine their relevance in the analysis section.

[7] The asserted fact states that Clark had the Policies and Procedures Handbook "in his possession at the time of his death," Response ¶ 2, at 3, but the deposition transcript indicates that Budget Inn, where Clark was living, sent the items from Clark's hotel room, which included the Handbook, to K. Clark after Clark's death, see K. Clark Depo. at 116:19-117:16 (Roach, K. Clark).  The Court will modify the asserted fact to reflect the evidence.

Kaylea Clark[8] at 116:19-117:16 (Roach, K. Clark), taken June 28, 2013, filed September 23, 2013

(Doc. 83-1)("K. Clark Depo."); Policies and Procedures Handbook, filed September 23, 2013

(Doc. 83-2); Response ¶ 2, at 3 (setting forth this fact).[9]   The "safety policy statement" in the

Policies and Procedures Handbook states:

> Our team approach to accident prevention and safe work practices will ensure that *dm*Dickason field employees are provided a working environment that promotes safety, health and the professionalism that you and our clients have the right to expect.   Our primary concern is for your safety and welfare.   In order the [sic] achieve this goal, guidelines have been established that recognizes each of our responsibilities:
>
> - *dm*Dickason will promote a safe and healthy work place for all of our employees
>
> - Client and supervisors who control the workplace will demonstrate a commitment to an accident free workplace
>
> - Temporary employees must take responsibility to work safely and observe the client's safe work practices.
>
> Safety rules and safe work practices are designed as a preventative tool to ensure your safety.   However, they are only as effective as your willingness to cooperate. These guidelines are not optional.   As a condition of your employment, know these guidelines and consider them required elements of your job assignment.
>
> *dm*Dickason takes the responsibility as your employer very seriously, and we have gone to great lengths to provide a safe work environment.   If you are injured on the job, *dm*Dickason will deal promptly with legitimate claims and workers compensation insurance will pay medical expenses and wages.   *dm*Dickason has extensive experience investigating claims and will fight fraudulent claims with all available resources.

---

[8] K. Clark is J. Clark's daughter.   See K. Clark Depo at 116:19-117:1 (Roach, K. Clark).

[9] The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."   Dickason Reply at 3.   Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

Policies and Procedures Handbook at 3.   See Response ¶ 10, at 4 (setting forth this fact).[10]   While

working at the City of Las Cruces Recycling Center, J. Clark was subject to the same rules and

regulations as the City of Las Cruces employees and worked under Tafoya's supervision.   See

Garcia Depo. at 124:8-125:5 (Maestas, Garcia); MSJ ¶ 2, at 2 (setting forth this fact); Response at

3 (not disputing this fact).

Employees were not trained on safe operation of the baler until after J. Clark's accident.

See Deposition of Ernesto De La Rosa at 87:17-19 (Jamieson, De La Rosa), taken July 18, 2013,

filed September 23, 2013 (Doc. 83-3)("De La Rosa Depo."); Response ¶ 3, at 3 (setting forth this

fact).[11]   Although *dm*Dickason Personnel knew its employees would be working around the baler

at the Recycling Center, no one from *dm*Dickason Personnel came onto the site to inspect the work

environment before J. Clark's accident.   See Tafoya Depo. at 107:15-110:22 (Roach, Tafoya);

Response ¶ 11, at 4 (setting forth this fact).[12]   It was dangerous to go into the baler hopper under

---

[10] Lopez' asserted fact states: "According to The Policies and Procedures Handbook of dmDickason, Mr. Clark was ensured that he would be provided a working environment that promotes safety and that it would promote a safe and healthy workplace."   Response ¶ 10, at 4. Instead of summarizing or characterizing what the Policies and Procedures Handbook provides, the Court is quoting directly from the Policies and Procedures Handbook.
   The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."   Dickason Reply at 3.   Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

[11] The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."   Dickason Reply at 3.   Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

[12] The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."   Dickason Reply at 3.   Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

the circumstances at the time of J. Clark's death.   See De La Rosa Depo. at 67:17-19 (Jamieson, De La Rosa); Response ¶ 4, at 3 (setting forth this fact).[13]   When a jam occurred in the baler, a worker would climb into the baler to try to unjam it manually, while the baler remained energized and was not shut off; Garcia testified that, in his experience, the baler probably jammed about fifty times.   See Garcia Depo at 46:8-:49:2 (Jamieson, Garcia); Response ¶ 5, at 3 (setting forth this fact).[14]   Before the accident, Tafoya knew that the Recycling Center machinery was dangerous and was fighting for enhanced safety procedures in recycling, but her safety concerns were ignored.   See Deposition of Bonnie Tafoya at 83:8-86:20 (Jamieson, Tafoya), taken July 19, 2013, filed September 23, 2013 (Doc. 83-5)("Tafoya Depo."); Response ¶ 7, at 3 (setting forth this fact).[15]

The parties dispute whether the baler was defective and unreasonably dangerous, and whether the manufacturer could reasonably foresee such defects. [16]   According to Lopez' experts,

---

[13] The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."  Dickason Reply at 3.  Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

[14] The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."  Dickason Reply at 3.  Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

[15] The Dickason Defendants state that this fact is "immaterial to Dickason's summary judgment motion."  Dickason Reply at 3.  Because contending that a fact is immaterial is not disputing the fact, the Court will deem the fact admitted and will, as necessary, determine the fact's relevance in the analysis section.

[16] Defendants American Baler Company and Lindemann Recycling Equipment, Inc. ("LREI") argue that the Court should not accept Lopez' asserted facts in paragraph 8 -- that the baler was defective and unreasonably dangerous -- and in paragraph 9 -- that the manufacturer could foresee that the baler was defective and unreasonably dangerous -- as undisputed material facts for three reasons: (i) the facts are "supported solely by inadmissible hearsay in the form of

unauthenticated expert reports"; (ii) the facts are "relevant solely to the issue of breach of an alleged contract between Plaintiff and the Dickason Defendants and are, therefore, immaterial to Plaintiff's Response"; and (iii) "American Baler and LREI have not yet disclosed their experts who will challenge and rebut the conclusions of Plaintiff's experts, thereby creating a disputed issue of material fact."  American Baler Reply at 2-3.

American Baler and LREI argue that the expert reports, which the Plaintiffs cited as support for their asserted facts 8 and 9, constitute inadmissible hearsay.  See American Baler Reply at 3-4 (citing, e.g., Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *10 (D.N.M. Jan. 18, 2013)(Browning, J.)(stating that the Court's common practice is to exclude expert reports, because they constitute inadmissible hearsay); Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995)(precluding the use of inadmissible hearsay testimony in summary judgment).  American Baler asserts that the Plaintiffs did not meet rule 56's requirements, because the reports do not include affidavits and are not authenticated, and, thus, the Court cannot consider the reports in the summary judgment determination.  See American Baler Reply at 4 (citing Ortiz v. Wingard, 173 F. Supp. 2d 1155, 1163 (D.N.M. 2001)(Smith, M.J.)).  They contend that "whether Jim Clark was placed in a safe workplace is immaterial" to the MSJ, because this fact would "go only to the issue of the alleged breach of the alleged employment contract."  American Baler Reply at 4-5.  Further, American Baler and LREI assert that they "have not yet completed the discovery necessary to respond to and rebut Plaintiff's experts' opinions."  American Baler Reply at 5-6.  Their attorney attached an affidavit to the American Baler Reply explaining that American Baler and LREI intend to respond to these facts after they disclose their experts.  See Fed. R. Civ. P. 56(d) Affidavit of Eric W. Matzke ¶¶ 5-8, at 2, filed October 10, 2013 (Doc. 86-1).

At the hearing, American Baler and LREI explained that they filed the American Baler Reply to "make sure the record is clear that we object to the two statements being captioned as undisputed or material facts and reserve our right to vigorously object and deny these going forward up to trial."  Tr. at 16:9-13 (Gonring).  Lopez explained that she included paragraphs 8 and 9 to show that there is a dispute regarding whether Clark was placed in a safe work environment.  See Tr. at 16:25-17:7 (Roach).  She contended that, at the motion for summary judgment stage, the Dickason Defendants would have to prove as an undisputed fact that the workplace was safe, and she introduced facts 8 and 9 to show that there is a dispute regarding whether the work place was safe.  See Tr. at 17:7-13 (Roach).  Lopez explained that she took the experts' depositions after filing the Response, asked for leave to present those depositions, but asserted that, with or without the experts' opinions, there is a question of fact whether Dickason placed Clark in a safe workplace.  See Tr. at 17:23-19:13 (Roach).  Neither party supplemented the record with additional expert depositions after the hearing.

The Court recognizes that it cannot rely on evidence that will not be admissible at trial.  See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.").  The Court can rely, however, on evidence submitted in a form that would be inadmissible at trial as long as the evidence would eventually be in an admissible form:

> This does not mean that evidence must be submitted in "a form that would be admissible at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 . . . (1986).

the baler was defective and unreasonably dangerous in its intended use for several reasons, including the failure of the machine to have interlocked access doors to the machine that would de-energize the machine when a worker entered.  See Report on a Fatal Incident Involving a Paper Baler by Michael Huerta at 2-6, filed September 23, 2013 (Doc. 83-6)("Huerta Report"); Expert Report Lopez/Clark v. American Baler and LREI, incident November 17, 2007 by Tom Lawless at 1-2, filed September 23, 2013 (Doc. 83-7)("Lawless Report"); Preliminary Report Re: Lopez v. American Baler Company by William F. Kitzes at 1-5, filed September 23, 2013 (Doc. 83-8)("Kitzes Report"); Response ¶ 7, at 4 (setting forth this fact); American Baler Company and Lindemann Recycling Equipment, Inc.'s Reply to Plaintiff's Response to the Dickason Defendants' Motion for Summary Judgment for the Purpose of Disputing and Objecting to Plaintiff's Additional Material Facts at 1, filed October 10, 2013 (Doc. 86)("American Baler Reply")(disputing this fact).  Lopez' experts assert that it was foreseeable and known to the manufacturer that the baler jammed, that manual unjamming occurred, and that workers would be in the machine while it was energized in the absence of interlocked access.  See Huerta Report at

---

Indeed, parties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form.  Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005).  However, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury" in some form.  Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(citing Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence")).

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006).  Although the parties have not submitted expert depositions to show whether the baler and the workplace were safe, the parties seem to agree that the facts in paragraphs 8 and 9 are disputed; Lopez explained at the hearing that she included the facts to demonstrate a factual dispute.  The Court will thus indicate the factual dispute.

2-6; Lawless Report at 1-2; Kitzes Report at 1-5; Response ¶ 9, at 4 (setting forth this fact); American Baler Reply at 1 (disputing this fact).

## PROCEDURAL BACKGROUND

Lopez filed a lawsuit for wrongful death against the Defendants on November 3, 2012, in the First Judicial District Court for Santa Fe County, New Mexico.  See Complaint at 1.  The Defendants removed this action to federal court on March 24, 2011.  See Defendant Lindemann Recycling Equipment, Inc.'s Notice of Removal of Action ¶ 1, at 1, filed March 14, 2011 (Doc. 1). In Count I, Lopez alleges that the Dickason Defendants "breached their duties to Mr. Clark by failing to inspect and assure that they were placing their employee, Mr. Clark in a safe work place."  Complaint ¶ 13, at 4.  In Count II, Lopez brings product liability claims against Defendants American Baler Company, Metso Lindemann, and Lindemann Recycling Equipment, Inc.  See Complaint ¶ 19, at 5.

The Dickason Defendants move for summary judgment, because they argue that J. Clark's exclusive remedy against them is under the NMWCA.  They understand Lopez to be making a tort claim under Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148, which they assert requires that Lopez plead and prove that:

> (1) Dickason engaged in an intentional act or omission without just cause or excuse that was *objectively* expected to result in the injury that Clark suffered; (2) that Dickason *subjectively* expected that its intentional act or omission would result in Clark's injuries, or that Dickason utterly disregarded the consequences that intentional act would result in injury; and (3) that Dickason's intentional act or omission proximately caused Clarks' injuries and death.

MSJ at 3 (emphasis in original).   In the Dickason Defendants' view, Lopez has not proved any of these elements; they point out that no *dm*Dickason Personnel employee supervised or directed

J. Clark to enter the baler immediately before his accident, and so the Dickason Defendants could not have engaged in any acts, objectively or subjectively, to give rise to liability under <u>Delgado v. Phelps Dodge Chino, Inc.</u>   <u>See</u> MSJ at 4-8.

Lopez contends that the Court should not interpret the NMWCA to preclude her claim against the Dickason Defendants; she asserts her claim is not based in tort, and thus, is not a claim under <u>Delgado v. Phelps Dodge Chino, Inc.</u>, but that she is bringing a breach-of-contract claim. <u>See</u> Response at 5.   She points to language from the Policies and Procedures Handbook, which, in her view, demonstrates the Dickason Defendants' contractual obligation to provide a safe workplace, including that "'*dm*Dickason will promote a safe and healthy work place for all of our employees,'" that the safety rules and safe work practices are "'not optional,'" and that "'*dm*Dickason takes the responsibility as your employer very seriously, and we have gone to great lengths to provide a safe work environment.'"   Response at 5 (quoting the Policies and Procedures Handbook).   Lopez argues that "the Policies and Procedures Handbook constitutes an employment contract," and cites New Mexico cases that indicate "'employee handbooks, personal policy guides, and similar documents may constitute implied employment contracts . . . when the document controls the employer-employee relationship such that employees may reasonably rely on the document's provisions and may expect the employer to conform to the procedures it outlines . . . .'"   Response at 6 (quoting <u>Whittington v. N.M. Dep't of Pub. Safety</u>, 2004-NMCA-124, ¶ 7, 136 N.M. 503, 506, 100 P.3d 209, 212).   Lopez argues that, because J. Clark kept his copy of the Policies and Procedures Handbook in his hotel room where he was living, it "is certainly strong evidence that Jim Clark relied on it," and that the Policies and Procedures Handbook "is clear that its provisions are to be followed and can be relied upon by

employer and employee."   Response at 6.

Lopez contends that, when an employer contractually assumes safety responsibilities, the employer should not be excused from its duties by asserting that the employee's exclusive remedy is through the NMWCA.   See Response at 7.   In Lopez' view, barring the employee's contractual claims would mean that "the employer's contractually assumed obligations, representations and responsibilities will be unenforceable even though employee's obligations will be enforceable," resulting in perverse incentives for employers to make promises to employees regarding safety and work environment issues, and not be bound by them.   Response at 7, 8.   Lopez points to a New York state case, in which the Court of Appeals of New York held that the workers' compensation coverage's exclusivity provision "does not bar an employee's contract claim even though the claim is literally for injuries"; for example, if an employer agrees to provide medical or life insurance, then the employer cannot avoid that contractual responsibility even when the employee brings the contract action on account of the employee's injury or death.   Response at 7 (citing In re Elrac, Inc. v. Exum, 961 N.E.2d 643, 644-45 (N.Y. 2011)).   Lopez also asserts that New Mexico has a strong public policy in favor of the freedom to contract and so a party may relinquish statutory protections unless the contract is void as contrary to public policy.   See Response at 8.

Lopez argues that the Dickason Defendants failed to provide a "safe workplace" and a "working environment that promoted safety."   Response at 9.   She asserts that, although the Dickason Defendants were aware that J. Clark would be working around the baler, no Dickason employees came to inspect the workplace.   See Response at 9-10.   Lopez contends that the baler was dangerous; she emphasizes that Tafoya recognized this risk and attempted to improve the safety procedures, but Tafoya's safety concerns were ignored.   See Response at 9.   Lopez alleges

that the baler was defectively designed, because it jammed often and it was reasonably foreseeable that workers would enter the compression chamber to manually unjam the machine, yet the manufacturer did not include proper access, including an interlock system that would de-energize or de-activate the machine when the access door is opened and a worker enters the machine.   See Response at 9.

Lopez concludes that the Policies and Procedures Handbook "is clear evidence of a contract between Dickason and Jim Clark.   The defective and dangerous baler as well as the unsafe work environment was a breach of that contract."   Response at 10.   She argues that there are "fact issues concerning whether there is an employment contract, whether there was a breach of that employment contract, and whether that contract establishes certain employee rights that are not barred by the exclusivity provisions of the Workers' Compensation Act."   Response at 10. Lopez asserts that the Dickason Defendants did not establish that the NMWCA provides the exclusive remedy.   See Response at 10.

The Dickason Defendants argue that there is "no legal basis" for Lopez' position that the Policies and Procedures Handbook created an implied contract by which Lopez can avoid summary judgment; they argue that Lopez has not presented admissible evidence to establish that J. Clark relied on the Policies and Procedures Handbook, and that, even if the Policies and Procedures Handbook created an implied contract, it did not waive the NMWCA's exclusivity provisions.   See Dickason Reply at 1-2.

First, the Dickason Defendants assert that they did not have an implied employment contract with J. Clark based on the Policies and Procedures Handbook.   See Dickason Reply at 3. The Dickason Defendants argue that the only evidence to which Lopez can point that J. Clark

relied on the Policies and Procedures Handbook is that from the K. Clark Depo., in which K. Clark states that the Policies and Procedures Handbook was among J. Clark's personal items in the hotel room where he was living, a statement that they contend, without explaining, is not admissible evidence.  See Dickason Reply at 3-4.   In the Dickason Defendants' view, Lopez does not have any evidence that they or J. Clark relied on the portion of the Policies and Procedures Handbook regarding a safe work place "so as to expect Dickason to undertake an obligation not already imposed by the common law."  Dickason Reply at 4.  According to the Dickason Defendants, "[w]ithout a showing that an implied contract of employment existed, Plaintiff's defense to summary judgment fails as a matter of law."   Dickason Reply at 4.

Next, the Dickason Defendants argue that, even if the Policies and Procedures Handbook created an implied contract, it did not waive the NMWCA exclusive-remedy provisions.  See Dickason Reply at 4.   Although Lopez relies on City of Artesia v. Carter, 1980-NMCA-006, 94 N.M. 311, 610 P.2d 198, to demonstrate that an implied employment contract can waive the NMWCA's exclusive-remedy provisions, the Dickason Defendants point out that City of Artesia v. Carter involved an express contract of indemnity; the Court of Appeals of New Mexico "made it clear that an employer can voluntarily relinquish the protections provided by the exclusive remedy provisions" of the NMWCA, "but also made it clear that a waiver or relinquishment of these protections cannot be implied given the plain and unequivocal language" in the NMWCA's exclusivity provisions.  Dickason Reply at 5.  According to the Dickason Defendants, "[a]ny waiver or relinquishment must be expressed clearly," and, further, New Mexico courts have limited City of Artesia v. Carter's application "to situations where an employer has entered into an express contract of indemnity or has voluntarily relinquished the statutory protections provided by

the exclusive remedy provisions of the Act."   Dickason Reply at 5.   The Dickason Defendants argue that the Policies and Procedures Handbook does not contain an express waiver of the NMWCA's exclusivity provisions, and "does not contain any language that even remotely suggests that such a waiver was intended"; instead, the Policies and Procedures Handbook "merely repeats what New Mexico's common law already requires," namely, providing a safe workplace. Dickason Reply at 6.

The Dickason Defendants contend that Lopez' position ignores the NMWCA's plain language, which provides:

> "The Workers' Compensation Act [52-1-1 NMSA 1978] provides **exclusive remedies.   No cause of action** outside the Workers' Compensation Act shall be brought by an employee or dependent against the employer or his representative, including the insurer, guarantor or surety of any employer, **for any matter relating to the occurrence of or payment for any injury or death** covered by the Workers' Compensation Act."

Dickason Reply at 6-7 (emphasis and brackets in Reply)(quoting N.M. Stat. Ann. § 52-1-6(E) (alterations omitted).   The Dickason Defendants contend that the NMWCA is "all inclusive, and includes actions based on contract," and, thus, even if the Policies and Procedures Handbook created an implied contract of employment, that fact would not have legal significance under the statute.   Dickason Reply at 7.   Further, the Dickason Defendants point out that the Complaint seeks damages for wrongful death; although Lopez attempts to characterize her claims as a breach of contract, she is seeking damages for J. Clark's wrongful death, which the NMWCA's exclusivity provisions preclude.   See Dickason Reply at 7.   Although Lopez cites a New York case, the Dickason Defendants argue that the case cannot save Lopez' claim, because Lopez does not explain "what additional rights the alleged contract confers upon Clark" and does not cite any

- 15 -

New Mexico law that supports her position.   Dickason Reply at 8.

Finally, the Dickason Defendants argue that Lopez has not refuted the facts which they set forth that entitle them to summary judgment, and that, instead, Lopez has attempted to "deflect the Court's attention from the real issue created by Plaintiff's wrongful death claims against Dickason by arguing that an implied contract of employment between J. Clark and Dickason somehow changes the analysis or created some unspecified rights" that the NMWCA's exclusive-remedy provisions would not bar.   Dickason Reply at 9.

The Court held a hearing on January 23, 2014.   See Transcript of Hearing, taken January 23, 2014 ("Tr.").[17]   The Court explained at the outset that the Delgado v. Phelps Dodge Chino, Inc. standard is a high one and that it did not think Lopez could "scale the requirements of Delgado."   Tr. at 2:15-20 (Court).   Regarding Lopez' implied contract theory, the Court said that it thought New Mexico would probably follow the New York Court of Appeals' approach if faced with a similar situation and conclude that the NMWCA does not preempt every contract claim, but that it was not sure that this case presented an example of a contract claim that New Mexico courts would permit.   See Tr. at 2:20-3:12 (Court).

The Dickason Defendants agreed with the Court's inclination regarding the Delgado v. Phelps Dodge Chino, Inc. claim, explaining that, with the nature of temporary workforce solutions companies like dmDickason Personnel, it would be nearly impossible to fit an on-the-job injury into the Delgado v. Phelps Dodge Chino, Inc. requirements.   See Tr. at 4:2-5:16 (Maestas, Court). On the implied contract theory, the Dickason Defendants emphasized that, regardless of what Lopez calls the claim, the relief he is seeking is for wrongful death, which the NMWCA's

---

[17]   The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

exclusive-remedy provisions preclude.   See 5:19-6:15 (Maestas).   The Dickason Defendants

compared the New Mexico statute to New York's, and argued that New Mexico's

exclusive-remedy provisions are "broader and more encompassing."   Tr. at 6:16-7:11 (Court,

Maestas).   The Dickason Defendants reiterated that the evidence which Lopez produced to

demonstrate that J. Clark relied on the Policies and Procedures Handbook -- testimony from

K. Clark that the Policies and Procedures Handbook was among the personal items that the hotel

sent her from J. Clark's hotel room -- did not demonstrate that J. Clark relied on the Policies and

Procedures Handbook, and even if it did, the Policies and Procedures Handbook does not include

express language that *dm*Dickason Personnel waived the NMWCA's exclusive-remedy

provisions.   See Tr. at 8:10-23 (Maestas).

> The Court gave a specific example and asked the Dickason Defendants to analyze it:
>
> Let's say that somebody had an employment contract which they were going to be
> paid $500,000 if they left this job, including . . . if they were killed on the site and
> the company would pay that.   Would you agree with me that the workman's comp
> would not preclude that action to collect that $500,000?

Tr. at 12:6-13 (Court).   The Dickason Defendants agreed with the Court that New Mexico courts

might be willing to adopt a rule similar to what the Court of Appeals of New York followed in

Elrac, Inc. v. Exum, but that the factual situation would not arise in New Mexico, because injured

workers can assert claims for uninsured motorist benefits against an employer's uninsured

motorist or automobile policy, subject to reimbursement rights under N.M. Stat. Ann. § 52-5-17.

See Tr. at 9:23-11:10 (Court, Maestas).   The Dickason Defendants explained that the NMWCA

does not preclude claims such as implied employment contracts, express employment contracts,

severance agreements, or benefits and salary agreements, but that they are arguing that, in this

case, which does not involve any formal documentation or agreement to the contrary, the NMWCA's exclusive-remedy provisions preclude any claims "arising out of an on the job accident" resulting in injury or death.   Tr. at 13:6-23 (Maestas).   When the Court asked how to distinguish its example from the situation that the situation in Elrac, Inc. v. Exum, the Dickason Defendants said that the situations are not distinguishable, other than that the NMWCA's exclusive-remedy provisions are broader than New York's.   See Tr. at 13:24-14:15 (Court, Maestas).

The Court noted that the cases that Lopez cites for the implied contract theory come mainly from cases that negate the employment-at-will doctrine in New Mexico, but do not arise in NMWCA cases; the only exception is that Elrac, Inc. v. Exum arises under New York's workers' compensation statute.   See Tr. at 19:14-20:1 (Court).   Lopez explained that she is using the implied contract theory to determine whether the Policies and Procedures Handbook created a contract between J. Clark and dmDickason Personnel, but that the Policies and Procedures Handbook expresses the contract's terms.   See Tr. at 20:2-20 (Roach).   Lopez argued that, although the common law requires employers to provide a safe work place, when employers enter a contract to provide a safe working environment, an employee may pursue a tort claim under the common law or a breach-of-contract claim under the contract when the employer does not provide a safe working environment.   See Tr. at 20:21-21:21 (Court, Roach).   The Court questioned whether Lopez is asking the Court to use the implied contract doctrine "for something that it's not been fashioned for."   Tr. at 21:22-22:4 (Court).   Lopez responded that an employment contract does not necessarily change whether the employee is at will, because the contract may address other terms, such as vacation time or benefits.   See Tr. at 22:5-23:3 (Roach).   The Court asked

- 18 -

whether the language in the Policies and Procedures Handbook regarding workplace safety rose to the standards of an implied contract.  See Tr. at 23:4-11 (Court).  Lopez argued that, although some employee handbooks or manuals may not create contractual relationships between employers and employees, the Policies and Procedures Handbook includes mandatory language regarding safety procedures, which, in Lopez' view, is sufficient to form a contract.  See Tr. at 23:12-24:13 (Roach).  She clarified that her position is not that at-will employees are limited to workers' compensation while contracted employees can pursue workers' compensation as well as breach-of-contract claims, because the at-will status refers to the circumstances in which an employer may terminate the employee, and because at-will employees may still have contract rights.  See Tr. at 24:24-25:17 (Roach).  Lopez directed the Court to City of Artesia v. Carter, in which the Court of Appeals of New Mexico said that the NMWCA's "exclusivity provision does not prohibit the employer from being sued for damages for wrongful death if the employer has contracted . . . otherwise."  Tr. at 27:21-25 (Roach).  Lopez argued that the existence of the Policies and Procedures Handbook was an implied contract between dmDickason Personnel and J. Clark, or that there is at least a fact question whether it was a contract, because the terms in the Policies and Procedures Handbook are mandatory.  See Tr. at 28:1-5 (Roach).  She explained that the Policies and Procedures Handbook requires employees to report to dmDickason Personnel when they cannot go to work, and that the Policies and Procedures Handbook states that employees will be terminated if they do not follow the policies.  See Tr. at 29:20-30:6 (Roach).  Because the Policies and Procedures Handbook controls the employees' conduct, Lopez argued that dmDickason Personnel cannot selectively abide by certain promises and not others.  See Tr. at 30:9-13 (Roach).  Lopez asserted that, although employers have a common-law duty to provide

a safe working environment, *dm*Dickason Personnel may not have had that duty without assuming the contractual duty, because the City of Las Cruces, not *dm*Dickason Personnel, was in charge of the workplace.   <u>See</u> Tr. at 28:9-21 (Roach).   She explained that, although the Policies and Procedures Handbook is not wrapped up in a package that says it is an employment contract, it is an implied employment contract with express terms, specifically, to ensure a safe workplace.   <u>See</u> Tr. at 31:8-21 (Roach).   Although *dm*Dickason Personnel promised to ensure a safe working environment, Lopez pointed out that the employees did not know that they should de-energize the baler before climbing into it, that Tafoya described the environment as dangerous, and, thus, that the Dickason Defendants did not hold up their end of the bargain.   <u>See</u> Tr. at 32:8-16 (Roach). Lopez said that, although the Complaint reads in some portions as a negligence claim, the language is broad enough to cover the contract claim, and that she was not aware of the Policies and Procedures Handbook until K. Clark's deposition.   <u>See</u> Tr. at 33:3-14 (Roach).   Lopez explained that public policy allows parties the freedom to contract as they see fit, which includes allowing employers and employees bargaining away the NMWCA's exclusive-remedy provision.   <u>See</u> Tr. at 34:14-35:12 (Roach, Court).   Lopez contended that allowing an employer who assumed a contractual obligation over and above the workers' compensation provisions to then hide behind the exclusive-remedy provisions of the NMWCA scheme and commit a fraud on the employee who was relying on the contract.   <u>See</u> Tr. at 36:23-37:13 (Roach).

The Dickason Defendants argued that they do not need to prove that they provided a safe work environment to prevail on the MSJ, and they pointed out that Lopez did not cite any case for her proposition that the Dickason Defendants need to prove that the work environment was safe on November 16, 2007.   <u>See</u> Tr. at 39:8-40:11 (Maestas, Court).   They contended that Lopez'

"arrangement really proves too much," because the Policies and Procedures Handbook provides that, if an employee is injured on the job, *dm*Dickason Personnel will deal promptly with legitimate claims and workers' compensation insurance, and will pay medical expenses and wages.   See Tr. at 40:13-41:2 (Maestas).   In the Dickason Defendants' view, this provision, if it creates a contract, provides that J. Clark agreed to accept workers' compensation benefits for on-the-job injuries.   See Tr. at 41:2-6 (Maestas).   The Dickason Defendants quoted from City of Artesia v. Carter, which states that, if an employer has waived the NMWCA's exclusive-remedy protections, public policy expressed by the limitations prohibits contribution from the employer and bars claims of liability based upon an implied agreement of indemnity.   See Tr. at 41:7-17 (Maestas).   The Dickason Defendants said that they "agree that an employer can waive the protections provided by the exclusive-remedy provisions of the act but it [h]as to be an express[] waiver."   Tr. at 41:17-20 (Maestas).   According to the Dickason Defendants, "if you look at the policy and procedure handbook as a contract and I don't think it is[,] but there is no language, express waiver language.   If it is a contract I would submit to you that there is an agreement by the parties to accept workers' compensation benefits."   Tr. at 43:6-11 (Maestas).   As far as reliance for an implied contract, the Dickason Defendants argued that the only proof was that the Policies and Procedures Handbook was among J. Clark's possessions, but that there is not any testimony or other evidence indicating that *dm*Dickason Personnel intended its employees to rely on the Policies and Procedures Handbook.   See Tr. at 43:11-18 (Maestas).   The Court said that it understood how an employee could rely on a handbook provision that indicated the employer would follow certain procedures before firing an employee, but that it was having a harder time understanding how an employee would rely on a handbook stating that the employer would

provide a safe working environment when New Mexico law already requires employers to provide safe working environments.   See Tr. at 44:2-16 (Court).   The Court asked the Dickason Defendants to respond to Lopez' argument that the Dickason Defendants would not have a duty under New Mexico law, because it did not provide the workplace but just helped to place J. Clark at the Recycling Center; the Dickason Defendants said that dual employer situations, such as the situation here, still require both employers to provide a safe working environment.   See Tr. at 44:24-45:18 (Court, Maestas).

Lopez clarified that she is making a breach-of-contract claim and not a claim under Delgado v. Phelps Dodge Chino, Inc.   See Tr. at 46:12-13 (Roach).   She argued that employers can waive the exclusive-remedy provisions without expressly stating as much, and that the promise to provide a safe workplace is enough to constitute a waiver.   See Tr. at 46:21-47:14 (Roach).   In Lopez' view, the facts of J. Clark's employment, where the Dickason Defendants worked with the City of Las Cruces to place J. Clark at the Recycling Plant and promised J. Clark a safe working environment, is similar to the waiver of the NMWCA's exclusive-remedy provisions in City of Artesia v. Clark, where the employer agreed to indemnify the City of Artesia. See 48:12-49:25 (Roach).   The Dickason Defendants pointed out that the Complaint states a negligence claim, but does not mention breach of contract.   See Tr. at 50:3-6 (Maestas).   Lopez explained that the Dickason Defendants did not disclose the Policies and Procedures Handbook in initial disclosures, and that she did not know about the Policies and Procedures Handbook until after she found it in the box from J. Clark's hotel room during K. Clark's deposition; further, she argued that the Complaint is broad enough to cover the breach-of-contract claim.   See Tr. at 50:11-52:1 (Roach).

The Court reiterated its inclination from the beginning of the hearing -- that New Mexico may recognize some contract claims that can survive the exclusivity provision, but that this contract claim is likely not one of them.  See Tr. at 52:7-13 (Court).  The Court said it was inclined to grant the MTD, but would take it under advisement.  See Tr. at 52:22-53:3 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[18] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing

---

[18]  Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at

trial.'"   <u>Colony Nat'l Ins. Co. v. Omer</u>, 2008 WL 2309005, at *1 (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 250.   A mere "scintilla" of evidence will not avoid summary judgment.   <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248).   Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.   <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 251 (quoting <u>Schuylkill & Dauphin Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539.   "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.   If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249 (citations omitted).   Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.   <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.   First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.   <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249.   Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 254.   Third, the court must resolve all reasonable

inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.   See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").   Fourth, the court cannot decide any issues of credibility.   See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.   This doctrine developed most robustly in the qualified-immunity arena.   In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.   550 U.S. at 378-81.   The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.   Fed. Rule Civ. Proc. 56(c).   As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"   Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 547, 586–587 (1986)(footnote omitted).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986).   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.   Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in <u>Thomson v. Salt Lake County</u>, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]"    <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1210 (10th Cir.
> 2008)(quoting <u>Scott [v. Harris]</u>, 550 U.S. at 380); <u>see also</u> <u>Estate of Larsen ex. rel
> Sturdivan v. Murr</u>, 511 F.3d 1255, 1258 (10th Cir. 2008).

<u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d at 1312.    "The Tenth Circuit, in <u>Rhoads v. Miller</u>, [352 F.

App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished), [19] ] explained that the blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]"

<u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d 1222, 1249 (D.N.M.2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury."   <u>Scott
> v. Harris</u>, 550 U.S. 372, 377 (2007).   "[T]his usually means adopting . . . the
> plaintiff's version of the facts," <u>id.</u> at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," <u>id.</u>
> at 380.   In <u>Scott</u>, the plaintiff's testimony was discredited by a videotape that

---

[19] <u>Rhoads v. Miller</u> is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.   <u>See</u> 10th Cir. R.
32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive
value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).   The Court finds
that <u>Rhoads v. Miller</u> has persuasive value with respect to material issues, and will assist the Court
in its preparation of this Memorandum Opinion and Order.

completely contradicted his version of the events.   550 U.S. at 379.   Here, there is
no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
testimony.   There is only other witnesses' testimony to oppose his version of the
facts, and our judicial system leaves credibility determinations to the jury.   And
given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems
go to the weight of his testimony, not its admissibility . . . .   Mr. Rhoads alleges
that his injuries resulted from a beating rendered without resistance or provocation.
If believed by the jury, the events he describes are sufficient to support a claim of
violation of clearly established law under <u>Graham v. Connor</u>, 490 U.S. 386, 395–96
(1989), and this court's precedent.

<u>Rhoads v. Miller</u>, 352 F. App'x at 291-92 (internal quotation marks omitted).  <u>See</u> <u>Lymon v.
Aramark Corp.</u>, 728 F. Supp. 2d at 1249-50 (quoting <u>Rhoads v. Miller</u>, 352 F. App'x at 291-92).
In a concurring opinion in <u>Thomson v. Salt Lake County</u>, the Honorable Jerome A. Holmes,
United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal
question of qualified immunity and "determine whether plaintiff's factual allegations are
sufficiently grounded in the record such that they may permissibly comprise the universe of facts
that will serve as the foundation for answering the legal question before the court" before inquiring
into whether there are genuine issues of material fact for resolution by the jury.   584 F.3d at 1326–
27 (Holmes, J., concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson,
J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the
qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## <u>LAW REGARDING THE NMWCA'S EXCLUSIVITY PROVISION</u>

The NMWCA, N.M. Stat. Ann. §§ 52-5-1 to -22, "provides the exclusive remedy against
employers for employees injured on the job," <u>Vigil v. Digital Equip. Corp.</u>, 1996-NMCA-100, ¶ 7,
122 N.M. 417, 925 P.2d 883.   <u>See</u> <u>Hamburg v. Sandia Corp.</u>, 2008-NMSC-015, ¶ 8, 143 N.M.
601, 603, 179 P.3d 1209, 1211 (explaining that the NMWCA's exclusivity provisions shield from

tort liability employers who comply with the NMWCA), provided the employer complies with the

NMWCA's preconditions, see Rivera v. Sagebrush Sales, Inc., 1994-NMCA-119, 118 N.M. 676,

677-78, 884 P.2d 832, 833-34.   The NMWCA provides:

> The right to the compensation provided for in this act, in lieu of any other liability whatsoever, to any and all persons whomsoever, for any personal injury accidentally sustained or death resulting therefrom, shall obtain in all cases where the following conditions occur:
>
> > A.     at the time of the accident, the employer has complied with the provisions thereof regarding insurance;
> >
> > B.     at the time of the accident, the employee is performing service arising out of and in the course of his employment; and
> >
> > C.     the injury or death is proximately caused by accident arising out of and in the course of his employment and is not intentionally self-inflicted.

N.M. Stat. Ann. § 52-1-9.   The NMWCA further indicates that

> [i]t provides exclusive remedies.   No cause of action outside the Workers' Compensation Act shall be brought by an employee or dependent against the employer or his representative, including the insurer, guarantor or surety of any employer, for any matter relating to the occurrence of or payment for any injury or death covered by the Workers' Compensation Act.   Nothing in the Workers' Compensation Act, however, shall affect or be construed to affect, in any way, the existence of or the mode of trial of any claim or cause of action that the worker has against any person other than his employer or another employee of his employer, including a management or supervisory employee, or the insurer, guarantor or surety of his employer.

N.M. Stat. Ann. § 52-1-6(E).   The foregoing exclusivity provisions also provide employees of an

employer that the NMWCA covers with immunity from suit in tort by co-employees.   See Street

v. Alpha Constr. Servs., 2006-NMCA-121, 140 N.M. 425, 426-27, 143 P.3d 187, 188-89 (citing

N.M. Stat. Ann. §§ 52-1-6(E); id. § 52-1-8)(additional citation omitted); Matkins v. Zero

- 29 -

Refrigerated Lines, Inc., 1979-NMCA-095, 93 N.M. 511, 517, 602 P.2d 195, 201 ("[A]n employee of an employer who has complied with the requirements of the Act is not subject to liability under the common law for the injury or death of a coemployee.").

One of the NMWCA's preconditions is that, at the time of the accident, the "employer has complied with the provisions thereof regarding insurance."   N.M. Stat. Ann. § 52-1-9(A).   See Peterson v. Wells Fargo Armored Servs. Corp., 2000-NMCA-043, 129 N.M. 158, 161, 3 P.3d 135, 138 ("In order to take advantage of the exclusive remedy provisions of the Act, an employer must comply with the provisions of the Act concerning insurance.")(citing N.M. Stat. Ann. §§ 52-1-6(C) & (D); id. § 52-1-8; id. § 52-1-9).   "If the employer fails to comply with those provisions, the worker can sue the employer either for compensation benefits or for damages in tort caused by the employer's negligence."   Peterson v. Wells Fargo Armored Servs. Corp., 2000-NMCA-042, ¶ 10 (citing Harger v. Structural Servs., Inc., 1996-NMSC-018, 121 N.M. 657, 666, 916 P.2d 1324, 1333).

The exclusivity of compensation under the NMWCA also rests on the existence of the employment relationship.   See Street v. Alpha Constr. Servs., 2006-NMCA-121, 140 N.M. 425, 426, 143 P.3d 187, 188 (citation omitted); Rivera v. Sagebrush Sales, Inc., 1994-NMCA-119, 118 N.M. 676, 680, 884 P.2d 832, 836.   A worker has an employment relationship with a putative employer if the worker "was a direct employee, a statutory employee, or a special employee.   In contrast, if [the worker] was an independent contractor, he would not have an employment relationship with [an alleged employer]."   Hamburg v. Sandia Corp., 2008-NMSC-015, ¶ 8.   See Rivera v. Sagebrush Sales, Inc., 118 N.M. at 678-79, 884 P.2d at 834-35.

A defendant may be a "special employer" entitled to protection under the exclusivity

provisions if three conditions are satisfied: (i) "the employee has made a contract of hire, express or implied, with the special employer"; (ii) "the work being done is essentially that of the special employer"; and (iii) "the special employer has the right to control the details of the work." Hamburg v. Sandia Corp., 2008-NMSC-015, ¶ 11 (internal quotation marks omitted).  The Court of Appeals of New Mexico has held that, with respect to the first element of the special employer test, i.e., "whether the employee has made a contract of hire with the special employer, the employee must have consented to the employment relationship."  Rivera v. Sagebrush Sales, Inc., 118 N.M. at 679, 884 P.2d at 835 (citing 1C A. Larson, Workmen's Compensation Law § 48.12 at 8-409 (2005)(noting that the employee's informed consent to a contract of hire is required, because the employee gives up rights when he or she enters into a new employment relationship, specifically the right to sue the employer at common law for negligence, and therefore it is necessary to show deliberate, informed consent to establish the existence of the new relationship)); 1C Larson, supra, § 48.12, at 8-409 (citing Antheunisse v. Tiffany & Co., 551 A.2d 1006, 1008 (N.J. App. Div. 1988)(holding that worker impliedly contracted for the employment relationship where the worker knew she would be hired out to various temporary employers, voluntarily reported to work, and followed the special employer's instructions); Santa Cruz Poultry, Inc. v. Superior Ct., 239 Cal. Rptr. 578, 580, 582-83 (Cal. 1987)(holding that the worker made a contract of hire with the employer, because the employer's control over worker's job performance implies, as a matter of law, the employment relationship between them); English v. Lehigh County Auth., 428 A.2d 1343, 1353-54 (Pa. 1981)(holding that the worker made a contract of hire, because the worker submitting himself to the control and supervision of the special employer demonstrates consent to employment); Wright v. Habco, Inc., 419 S.W.2d 34, 36 (Mo. 1967)(holding that the

- 31 -

worker consented to work for the special employers and thus that a contract for hire existed, because the worker entered into employment relationship with a labor broker and worked under the special employer's supervision for several weeks before the accidental injury)).

In Vigil v. Digital Equipment Corporation, the Court of Appeals of New Mexico concluded that the employment relationship between a corporation and the temporary worker whom an employment agency hired and lent to the corporation met the requirements for a finding of special employment, rendering the temporary worker's remedy for injuries sustained at the corporate work site limited to the NMWCA.  See 1996-NMCA-100, 122 N.M. at 420, 925 P.2d at 886. The Court of Appeals of New Mexico held that the worker impliedly consented to the employment relationship.  See 1996-NMCA-100, ¶ 19.   The Court of Appeals of New Mexico explained that the plaintiff consented to work for the corporation and a contract could be implied, because the worker "reported for work at [the corporation] and submitted to the supervision of [the corporation] for eight months prior to the accident, [the plaintiff] was paid according to the work he did for [the corporation], and [the corporation] had the power to terminate [the plaintiff's] temporary employment at [the corporation]" if the plaintiff's work was unsatisfactory. 1996-NMCA-100, ¶ 19.

In Castillo v. McCarthy Building Cos., No. 30,939, 2013 WL 4515751 (N.M. Ct. App. Apr. 11, 2013), the Court of Appeals of New Mexico again addressed the question of implied consent to an employment relationship in the context of a special employment claim under the NMWCA.   In Castillo v. McCarthy Building Cos., the defendant was the general contractor on a hotel construction project, and the plaintiff -- an employee of the defendant's drywall subcontractor who had been assigned to work at the defendant's site with a clean-up composite

crew on the day of the accident -- was injured when he fell several stories at the defendant's job site.   See 2013 WL 4515751, at *1.   The Court of Appeals of New Mexico concluded that the plaintiff accepted an assignment to work for the defendant, because it was undisputed that the plaintiff was assigned to the composite crew the day of the accident; that the plaintiff was aware that the defendant operated the composite crew; and that the plaintiff worked for the composite crew at least part of the day.   See 2013 WL 4515751, at *3.   The Court of Appeals of New Mexico held:   "Therefore, Plaintiff's acceptance of this assignment is sufficient to establish as a matter of law an implied contract for hire between Plaintiff and Defendant for the purpose of the special employer test."   2013 WL 4515751, at *3.

While employees of an employer covered by the NMWCA are also immune from suit in tort by co-employees under the NMWCA's exclusivity provisions, see Street v. Alpha Constr. Servs., 2006-NMCA-121, ¶ 7 (citations omitted), immunity is not extended to co-special employees of a shared special employer.   In Street v. Alpha Construction Services, the Court of Appeals of New Mexico distinguished special co-employees from co-employees and held that special co-employees are not immune from liability.   See 2006-NMCA-121, ¶ 11.   In that case, the plaintiff was the direct employee of Technadyne Engineering Consultants, but a special employee of Sandia Corporation pursuant to a contract between Technadyne Engineering and Sandia Corporation under which the plaintiff provided administrative support services at Sandia Corporation.   See 2006-NMCA-121, ¶¶ 1-2.   The defendant Alpha Construction Services was a roofing company that provided employees to Sandia Corporation to undertake roofing repairs through a contract between Alpha Construction and Sandia Corporation.   See 2006-NMCA-121, ¶ 2.   The plaintiff sued Alpha Construction for injuries that the plaintiff allegedly sustained

because of Alpha Construction's roofing activities.   See 2006-NMCA-121, ¶ 2.   The Honorable

Roderick T. Kennedy, then Judge and now Chief Judge of the Court of Appeals of New Mexico,

wrote in his dissent that, if the plaintiff, who was a Sandia Corporation special employee, had sued

one of Sandia Corporation's direct employees, the direct employee would have been entitled to

immunity under the NMWCA, provided the plaintiff could establish that the NMWCA covered

Sandia Corporation.   See 2006-NMCA-121, ¶¶ 20-21 (Kennedy, J., dissenting).   Because,

however, the plaintiff sued another special employee of Sandia Corporation, and this other special

employee had a different direct employer from the plaintiff's direct employer and worked for

Sandia Corporation under a different contract from the plaintiff's contract, the NMWCA did not

cover the defendant special employee.   See 2006-NMCA-121, ¶ 11.

In so holding, the Court of Appeals of New Mexico reasoned that special co-employees

were not entitled to immunity, because the "*quid pro quo* for the protection afforded to the

workers" was missing and therefore could not provide the basis for any immunity the NMWCA

grants.   Street v. Alpha Constr. Servs., 2006-NMCA-121, ¶ 8.   The Court of Appeals of New

Mexico explained:

> "The reason for the employer's immunity is the *quid pro quo* by which the
> employer gives up its normal defenses and assumes automatic liability, while the
> employee gives up his or her right to common-law verdicts.   This reasoning can be
> extended to the tortfeasor coemployee, who also is involved in this compromise of
> rights.   Perhaps, so the argument goes, one of the things the coemployee is entitled
> to expect in return for what he or she has given up is freedom from common-law
> suits based on industrial accidents in which that coemployee is at fault."

2006-NMCA-121, ¶ 8 (quoting 6 Larson, supra, § 111.03[2], at 111-12).   In the case of a

co-special employee, however, the quid pro quo is not present.   Thus, while "[a] special employer

has a workers' compensation liability to the direct employer's employees, and therefore receives

the *quid pro quo* of immunity from suit," "direct employers -- such as Alpha and Technadyne here -- have no comparable liability to each other's employees, or to the employees of other subcontractors, and therefore are not entitled to the *quid pro quo* of immunity from suit."   140 2006-NMCA-121, ¶ 11.   Thus, the Court of Appeals of New Mexico held that "the subcontractor or direct employer, in this case Alpha, who neither provided nor was required to provide insurance protections for employees of Technadyne, is not entitled to immunity from suit under the exclusivity provisions of the Act," because "Alpha and Plaintiff are not co-employees for purposes of the Act."   2006-NMCA-121, ¶ 13.   Because the NMWCA's immunity provisions did not cover the direct employer Alpha Construction from the plaintiff's claims, so too Alpha Construction's employees were not shielded from the plaintiff's claims.   Cf. 2006-NMCA-121, ¶ 7 (employees of an employer covered by the NMWCA are also immune under the NMWCA's exclusivity provisions from suit in tort by co-employees)(citations omitted).

### LAW REGARDING THE WILLFUL CONDUCT EXCEPTION TO THE EXCLUSIVITY OF THE NMWCA

When a worker suffers an accidental injury and the NMWCA's necessary preconditions are satisfied, the NMWCA "provides a scheme of compensation that affords profound benefits to both workers and employers.   The injured worker receives compensation quickly, without having to endure the rigors of litigation or prove fault on behalf of the employer."   Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, 131 N.M. 272, 274, 34 P.3d 1148, 1150 (citing Sanchez v. M.M. Sundt Constr. Co., 1985-NMCA-087, 103 N.M. 294, 296-97, 706 P.2d 158, 160-61 ("The Act, in effect, is designed to supplant the uncertainties of tort remedies and the burden of establishing an employer's negligence with a system of expeditious and scheduled payments of

lost wages based on accidental injury or death in the course and scope of employment.")).   "The employer, in exchange, is assured that a worker accidentally injured, even by the employer's own negligence, will be limited to compensation under the Act and may not pursue the unpredictable damages available outside its boundaries."   Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 12 (citing N.M. Stat. Ann. § 52-1-9).   The NMWCA represents the "result of a bargain struck between employers and employees.   In return for the loss of a common law tort claim for accidents arising out of the scope of employment, [the NMWCA] ensures that workers are provided some compensation."   Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, 127 N.M. 47, 52, 976 P.2d 999, 1004 (citation omitted).   See Kent Nowlin Constr. Co. v. Gutierrez, 1982-NMSC-123, 99 N.M. 389, 390, 658 P.2d 1116, 1117 (describing exclusivity as striking "a balance between the worker's need for expeditious payment and the employer's need to limit liability").

In Delgado v. Phelps Dodge Chino, Inc., the Supreme Court of New Mexico discussed the circumstances under which the NMWCA's exclusivity protections do not apply.   See 2001-NMSC-034, ¶¶ 13-16.   "The Legislature clearly intended to extend employers' privilege of immunity from tort liability, like the worker's privilege of expedited compensation, only to injuries accidentally sustained."   Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 15. While the Legislature explicitly provided in § 52-1-9(C) that exclusivity applies only when "'the injury or death is proximately caused by an accident arising out of and in the course of his [or her] employment[,]' . . . the Act contains no such provision with regard to employer misconduct." Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 15.   The Supreme Court of New Mexico explained that, to determine "when employer misconduct should deprive the employer of

exclusivity, our courts have, until now, uniformly [applied the] 'actual intent' test for determining whether employer misconduct renders a worker's injury compensable outside the Act."   Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 16 (citations omitted).   "Under this test, 'in order to allege matters which will render an employer liable in tort outside the [NMWCA], the plaintiff must allege matters indicating that the employer intended to injure the plaintiff.'" Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 16 (quoting Johnson Controls World Servs. Inc. v. Barnes, 1993-NMCA-004, 115 N.M. 116, 119, 847 P.2d 761, 764, overruled by Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, 131 N.M. 272, 34 P.3d 1148).

In Delgado v. Phelps Dodge Chino, Inc., the Supreme Court of New Mexico overruled the line of cases applying the actual-intent test to determine whether the NMWCA's exclusivity provisions grant employers immunity from suit, because the Supreme Court of New Mexico concluded "that the actual intent test favors employers."   2001-NMSC-034, ¶ 17.   The Supreme Court of New Mexico explained that, under the actual-intent test, a court

> ignore[s] the "degree of gravity or depravity of the employer's conduct" unless it was comparable to "a left jab to the chin," because only then will it be "non-accidental."   When determining whether to deprive a worker of compensation, however, we do consider the depravity of the worker's conduct, and withhold compensation when that conduct reaches a far lower level of intent than that attending a "left jab to the chin."

2001-NMSC-034, ¶ 22 (quoting 6 Larson, supra, § 103.03, at 103-9).   The Supreme Court of New Mexico explained that, "[u]nder the actual intent test, a single standard of culpability, namely willfulness, will prevent a worker from benefitting from the Act while preserving the corresponding benefits for the employer," and concluded that "[t]his bias violates the explicit mandate of Section 52-5-1, which demands the equal treatment of workers and employers."

2001-NMSC-034, ¶ 23.

The Supreme Court of New Mexico also reevaluated, and ultimately abandoned, the actual intent test, because the test "provides immunity from tort liability for all injuries inflicted by the employer except those rare, practically unprovable instances in which it is the employer's purpose to injure the worker," and allows "an employer who knows his acts will cause certain harm or death to an employee [to] escape personal responsibility for an act by merely claiming that he/she hoped the employee would make it."   2001-NMSC-034, ¶ 18.

> Even more disturbingly, the actual intent test encourages an employer, motivated by economic gain, to knowingly subject a worker to injury in the name of profit-making.   As long as the employer is motivated by greed, rather than intent to injure the worker, the employer may abuse workers in an unlimited variety of manners while still enjoying immunity from tort liability.

2001-NMSC-034, ¶ 18.

Finally, the Supreme Court of New Mexico noted that, in the past, it had applied a standard inconsistent with the actual intent test, thus implicitly rejecting the test.   In Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, 127 N.M. 47, 976 P.2d 1005, the Supreme Court of New Mexico held that the NMWCA's exclusivity provisions did not bar the plaintiff's tort claims based on sexual harassment, because Wal-Mart's supervisors acted intentionally.   See 1999-NMSC-013, ¶¶ 27-28.   The Supreme Court of New Mexico attributed intent to Wal-Mart, despite the absence of any proof that Wal-Mart actually intended to injure the plaintiff, because Wal-Mart knew that one of its supervisors was sexually harassing the plaintiff but failed to take action to stop the harassment.   See 1999-NMSC-013, ¶ 31.

For these reasons, the Supreme Court of New Mexico "expressly overrule[d] all case law that has required allegation or proof of an employer's actual intent to injure a worker as a

precondition to a worker's tort recovery." Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 23.   Instead, the Supreme Court of New Mexico held that, "[i]n keeping with Section 52-5-1, . . . the same standard of conduct that our Legislature deemed non-accidental for purposes of depriving a worker of compensation must determine whether an employer's misconduct renders an injury non-accidental for purposes of exclusivity." Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 24.   "[W]hen an employer intentionally inflicts or willfully causes a worker to suffer an injury that would otherwise be exclusively compensable under the Act, that employer may not enjoy the benefits of exclusivity, and the injured worker may sue in tort." Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 24.   Willfulness renders a worker's injury non-accidental, and therefore outside the scope of the NMWCA, when:

> (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury.

Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 26.

Under this test's first objective prong, a court determines "whether a reasonable person would expect the injury suffered by the worker to flow from the intentional act or omission." Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 27.   Under the second subjective prong, a court examines the worker's or employer's subjective state of mind:

> If the worker or employer decided to engage in the act or omission without ever considering its consequences, this prong is satisfied.   If, on the other hand, the worker or employer did consider the consequences of the act or omission, this prong will be satisfied only when the worker or employer expected the injury to occur.

Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 28.   Under the third prong, a court

must determine that the willfulness was a proximate cause of the injury.   See Delgado v. Phelps

Dodge Chino, Inc., 2001-NMSC-034, ¶ 29 (citations omitted).

### NEW MEXICO LAW REGARDING IMPLIED EMPLOYMENT CONTRACTS

In New Mexico, "an employment contract is for an indefinite period and is terminable at

the will of either party unless the contract is supported by consideration beyond the performance of

duties and payment of wages or there is an express contractual provision stating otherwise."

Hartbarger v. Frank Paxton Co., 1993-NMSC-029, 115 N.M. 665, 668, 857 P.2d 776, 779 (citation

omitted).   At-will employment relationships "can be terminated by either party at any time for any

reason or no reason, without liability."   Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857

P.2d at 779.   "New Mexico courts have recognized two additional exceptions to the general rule

of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge),

and an implied contract term that restricts the employer's power to discharge."   Hartbarger v.

Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779.

A promise or offer that supports an implied contract may be found in written

representations such as an employee handbook, in oral representations, in the parties' conduct, or

in a combination of representations and conduct.   See Newberry v. Allied Stores, Inc.,

1989-NMSC-024, 108 N.M. 424, 426, 773 P.2d 1231, 1233 (citation omitted).   "Under New

Mexico law, a personnel manual gives rise to an implied contract if it controlled the

employer-employee relationship and an employee could reasonably expect his employer to

conform to the procedures it outlined."   See Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773

P.2d 1234.   The question whether an employment relationship has been modified is a question

of fact.   See Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, 106 N.M. 664, 666, 748 P.2d

507, 509.   "An implied contract is created only where an employer creates a reasonable

expectation.   The reasonableness of expectations is measured by just how definite, specific, or

explicit has been the representation or conduct relied upon."   Hartbarger v. Frank Paxton Co., 115

N.M. at 672, 857 P.2d at 783.   If the alleged employer's promise is not sufficiently explicit, the

courts will not find an implied contract.   See Hartbarger v. Frank Paxton Co., 115 N.M. at 669,

857 P.2d at 780.

> Evidence relevant to this factual decision includes the language used in the
> personnel manual as well as the employer's course of conduct and oral
> representations regarding it.   We do not mean to imply that all personnel
> manual[s] will become part of employment contracts.   Employers are certainly
> free to issue no personnel manual at all or to issue a personnel manual that clearly
> and conspicuously tells their employees that the manual is not part of the
> employment contract and that their jobs are terminable at the will of the employer
> with or without reason.   Such actions instill no reasonable expectations of job
> security and do not give employees any reason to rely on representations in the
> manual.   However, if an employer does choose to issue a policy statement, in a
> manual or otherwise, and, by its language or by the employer's actions, encourages
> reliance thereon, the employer cannot be free to only selectively abide by it.
> Having announced a policy, the employer may not treat it as illusory.

Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. at 666-67, 748 P.2d at 509-10 (citation omitted).

"Whether an employer's words and conduct support a reasonable expectation on the part of

employees that they will be dismissed only in accordance with specified procedures or for

specified reasons generally is a question of fact for the jury."   Mealand v. E. N.M. Med. Ctr.,

2001-NMCA-089, ¶ 9, 131 N.M. 65, 33 P.3d 285.   "[B]ecause an employee's expectation based

on an employer's words or conduct must meet a certain threshold of objectivity, an employer may

be entitled to judgment as a matter of law if the employee's expectations are not objectively

reasonable."   West v. Wash. Tru Solutions, LLC, 2010-NMCA-001, ¶ 7, 147 N.M. 424,, 224 P.3d

651.   In deciding whether to grant summary judgment, the question is whether a reasonable jury

could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons.   See Mealand v. E. N.M. Med. Ctr., 2001-NMCA-089, ¶ 9.   "[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."   Beggs v. City of Portales, 2009-NMSC-023, ¶ 20, 146 N.M. 372, 210 P.2d 798.

## ANALYSIS

Based on the discussion with the parties at the hearing, the Court understands that Lopez' claim is not a tort claim under Delgado v. Phelps Dodge Chino, Inc., but is a breach-of-contract claim for failure to provide a safe workplace, based on an implied contract -- the Policies and Procedures Handbook, which states that *dm*Dickason Personnel will promote a safe work place, and that it will ensure that field employees are provide a working environment that promotes safety.   To the extent that the Complaint states a claim under Delgado v. Phelps Dodge Chino, Inc., the Court will dismiss the claim, because Lopez abandoned that claim at the hearing and because Lopez cannot meet the requirements of a claim under Delgado v. Phelps Dodge Chino, Inc.   Regarding the breach-of-contract claim for the failure to provide a safe workplace, the Court concludes that the Policies and Procedures Handbook did not create an implied contract between the parties, and further, the NMWCA's exclusive-remedy provisions bar a breach-of-contract claim for the failure to provide a safe workplace when the contract term is not express and specific. The Court will thus grant the MSJ.

## I.    THE COURT WILL DISMISS ANY ALLEGED CLAIM UNDER <u>DELGADO V. PHELPS DODGE CHINO, INC.,</u> BECAUSE LOPEZ ABANDONED THE CLAIM AND CANNOT MEET THE CLAIM'S REQUIREMENTS.

At the hearing, Lopez explained that her claim against the Dickason Defendants is not a claim under <u>Delgado v. Phelps Dodge Chino, Inc.</u>, but is a breach-of-contract claim.   <u>See</u> Tr. at 46:12-16 (Roach, Court).   Had Lopez asserted a claim under <u>Delgado v. Phelps Dodge Chino, Inc.</u>, the Court agrees with the Dickason Defendants that such a claim would fail.   As the Dickason Defendants point out, no other *dm*Dickason Personnel employees were present at the Recycling Plant on November 16, 2007, and no *dm*Dickason Personnel employees instructed J. Clark to enter the baler that day.   Further, that employees routinely entered the baler to manually unjam it undermines any argument that the Dickason Defendants engaged in an intentional act or omission that was objectively expected to result in J. Clark's injury.   The situation is analogous to <u>Dominguez v. Perovich Properties</u>, 2005-NMCA-050, 137 N.M. 401, 111 P.3d 721, in which the employees were required to perform periodic maintenance on a conveyor belt to remove rocks that would jam in the screens of the conveyor.   <u>See</u> 2005-NMCA-050, ¶ 3. The plaintiff was on the conveyor belt to remove rocks and debris from one of the screens when his supervisor, without warning, started the conveyor belt, and the employee was seriously injured. <u>See</u> 2005-NMCA-050, ¶ 3.   The plaintiff alleged that the employer failed to provide a safe work place by failing to install safety measures and devices that would have prevented his injuries, but the Court of Appeals of New Mexico determined that, "while it might be foreseeable that a co-employee might negligently start equipment operation, such foreseeability does not rise to the level contemplated under the first prong of the <u>Delgado</u> test."   2005-NMCA-050, ¶ 21.   Further, the fact that the dangerous activity was routine also influenced the Court of Appeals of New

Mexico to determine that the plaintiff could not maintain a claim under <u>Delgado v. Phelps Dodge Chino, Inc.</u>  See 2005-NMCA-050, ¶ 21.   Similarly, in <u>Chairez v. James Hamilton Construction Co.</u>, 2009-NMCA-093, 146 N.M. 794, the Court of Appeals of New Mexico dismissed the plaintiff's claim under <u>Delgado v. Phelps Dodge Chino, Inc.</u>, in part because there was not any evidence that the employer ordered the employee to perform the dangerous activity that resulted in his injuries.  <u>See</u> 2009-NMCA-093, ¶ 32.   The parties and the Court seem to agree that, to the extent the Complaint appears to be making a claim under <u>Delgado v. Phelps Dodge Chino, Inc.</u>, the claim fails.

II.     **THE COURT WILL DISMISS THE BREACH-OF-CONTRACT CLAIM AGAINST THE DICKASON DEFENDANTS, BECAUSE THE POLICIES AND PROCEDURES HANDBOOK DID NOT CREATE AN IMPLIED CONTRACT, AND BECAUSE THE EXCLUSIVE-REMEDY PROVISIONS OF THE NMWCA <u>BAR THE BREACH-OF-CONTRACT CLAIM.</u>**

Although the Complaint reads, at least in part, as though Lopez is bringing a negligence action, she asserted at the hearing that the Complaint's language is broad enough to cover the breach-of-contract claim.   The Policies and Procedures Handbook did not, however, create an implied contract between the Dickason Defendants and J. Clark.   Further, the NMWCA's exclusive-remedy provisions bar a breach-of-contract claim on an implied contract based on an employer's failure to provide a safe workplace, and thus, the Court will grant the MSJ and dismiss the breach-of-contract claim.

A.     **THE POLICIES AND PROCEDURES HANDBOOK DID NOT CREATE AN IMPLIED CONTRACT.**

In Lopez' view, the Policies and Procedures Handbook constitutes an employment contract, and cited cases in which the New Mexico appellate courts reversed a district court's

decision to grant summary judgment, holding that the written policies and procedures may constitute an employment contract.  See Response at 6.  For example, in Whittington v. New Mexico Department of Public Safety, the district court entered summary judgment for defendant State of New Mexico on the breach-of-contract claim, because it determined that the plaintiffs -- state police officers -- were not at-will employees, and thus, could not use what the district court viewed as an exception to the at-will employment rule to pursue claims for overtime compensation.  See 2004-NMCA-124, ¶ 4.   In determining whether the policy manual, on which the plaintiffs relied for contractual terms such as overtime payment, the Court of Appeals of New Mexico explained that the

> test to determine whether a document rises to the level of an implied contract is based on the degree of the parties' reliance on it: when the document controls the employer-employee relationship such that employees may reasonably rely on the document's provisions and may expect the employer to conform to the procedures it outlines, the terms of the document constitute the contract.

2004-NMCA-124, ¶ 7.   The Court of Appeals of New Mexico said that, "[n]ormally, the question of whether a manual modifies the employment relationship is a question of fact to be discerned from the totality of the parties' statements and actions regarding the employment relationship." 2004-NMCA-124, ¶ 8 (internal quotation marks omitted).  Based on affidavits that the parties submitted as evidence, the Court of Appeals of New Mexico agreed with the district court that the manual "control[led] the employer-employee relationship such that employees may reasonably rely on the Manual's provisions and may expect the employer to conform to the procedures it outlines."   2004-NMCA-124, ¶ 10.   The Court of Appeals of New Mexico determined that consideration for the implied contract could be implied by the parties' conduct.   See 2004-NMCA-124, ¶ 12.   The defendants argued that only implied employment contracts that

preclude at-will termination are valid written contracts for waiving the state's immunity from suit, but the Court of Appeals of New Mexico explained that "implied contracts often modify the at-will employment relationship, but these same contracts may contain other terms related to the employer-employee relationship."   2004-NMCA-124, ¶¶ 14-15.   The Court of Appeals of New Mexico reversed the entry of summary judgment, because the contract waived the state's immunity, but remanded for the district court to determine remaining arguments on the defendant's motion.   See 2004-NMCA-124, ¶¶ 1, 22.   Lopez also points to Garcia v. Middle Rio Grande Conservancy District, 1996-NMSC-029, 121 N.M. 728, 918 P.2d 7, in which the Supreme Court of New Mexico held that the personnel policy constituted a valid written contract sufficient to overcome the grant of immunity for the defendant governmental entity.   See 1996-NMSC-029, ¶¶ 9-11, 14.   The personnel policy outlined procedures by which the governmental entity could demote employees, and the Supreme Court of New Mexico explained that, if an employer chooses to issue a policy statement in a manual, the "employer cannot be free to only selectively abide by it. Having announced a policy, the employer may not treat it as illusory."   1006-NMSC-029, ¶¶ 12-13 (internal quotation marks omitted).

As these cases explain, a manual may constitute an implied contract between the employer and employee if the employees can reasonably rely on its provisions and can expect the employer to conform to its procedures.   In Lopez' view, the fact that J. Clark kept the Policies and Procedures Handbook in his hotel room where he was living is "certainly strong evidence that Jim Clark relied on it," and that the Policies and Procedures Handbook "itself is clear that its provisions are to be followed and can be relied upon by employer and employee."   Response at 6-7.   The Dickason Defendants, on the other hand, view Lopez' evidence as a "leap," particularly

- 46 -

regarding whether J. Clark relied on the Policies and Procedures Handbook.   Dickason Reply at 3.
They argue that the only evidence of an implied contract is the portion of the Policies and
Procedures Handbook that Lopez attached to the Response, but that she has not produced evidence
that J. Clark or the Dickason Defendants relied on the language regarding a safe work place so that
J. Clark could "expect Dickason to undertake an obligation not already imposed by the common
law."   Dickason Reply at 4.   "Whether an employee handbook has modified the employment
relationship is a question of fact to be discerned from the totality of the parties' statements and
actions regarding the employment relationship"; evidence may include "the language used in the
personnel manual as well as the employer's course of conduct and oral representations regarding
it."   Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, 106 N.M. 664, 666, 748 P.2d 507,
509 (internal quotation marks omitted).   What constitutes reasonable expectations based on an
employer's representations and norms of conduct is ordinarily a question of fact for the jury;
"[h]owever, before these expectations can be 'reasonable,' they must satisfy a certain threshold of
objectivity."   Kiedrowski v. Citizens Bank, 1995-NMCA-011, ¶ 9, 119 N.M. 572, 893 P.2d 468.
The relevant inquiry is whether the Policies and Procedures Handbook controlled the relationship
between J. Clark and the Dickason Defendants such that J. Clark could reasonably rely on its
provisions, and could expect the Dickason Defendants to conform to its procedures.   See
Whittington v. N.M. Dep't of Pub. Safety, 2004-NMCA-124, ¶ 7.

     Although J. Clark had the Policies and Procedures Handbook in the hotel room where he
was living, that fact does not indicate that he relied on the provisions in the Policies and Procedures
Handbook.   To say that he relied upon the handbook just because he had it in his hotel room is like
saying a judge relies on a law book because it is in his or her chambers; such a leap is speculation.

Such evidence is the proverbial "scintilla" of evidence.   Anderson v. Liberty Lobby, Inc., 477

U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will

be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Further, the precise location of the Policies and Procedures Handbook does not answer the relevant

inquiry -- whether the Policies and Procedures Handbook controlled J. Clark's and *dm*Dickason

Personnel's employment relationship, and whether J. Clark could reasonably expect *dm*Dickason

Personnel to conform to the procedures it outlined.   See Hartnett v. Papa John's Pizza USA, Inc.,

912 F. Supp. 2d 1066, 1107 (D.N.M. 2012)(Browning, J.)(explaining that the Supreme Court of

New Mexico has held that a personnel manual "'gives rise to an implied contract if it controlled the

employer-employee relationship and an employee could reasonably expect his employer to

conform to the procedures it outlined'" (quoting Newberry v. Allied Stores, Inc., 108 N.M. at 427,

773 P.2d at 1234)).   "An implied contract is created only where an employer creates a reasonable

expectation.   The reasonableness of expectations is measured by just how definite, specific, or

explicit has been the representation or conduct relied upon."   Hartbarger v. Frank Paxton Co., 115

N.M. at 672, 857 P.2d at 783.   If the alleged employer's promise is not sufficiently explicit, the

courts will not find an implied contract.   See Hartbarger v. Frank Paxton Co., 115 N.M. at 669,

857 P.2d at 780.   "General policy statements of a non-promissory nature contained in an

employee handbook are insufficient to create an implied contract."   Stieber v. Journal Publ'g Co.,

1995-NMCA-068, ¶ 13, 120 N.M. 270, 901 P.2d 201 (holding that the policy statement that the

defendant "is an equal opportunity employer" was a general policy statement and, thus, employer

did not breach an implied contract not to discriminate against the plaintiff).   See Sanchez v. The

New Mexican, 1987-NMSC-059, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (affirming the dismissal

of an implied contract claim on grounds that "the handbook lacked specific contractual terms which might evidence the intent to form a contract . . . [insofar as the] language is of a non-promissory nature and merely a declaration of defendant's general approach"); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1142, 1145 (D.N.M. 2011)(Browning, J.)(citing Stieber v. Journal Publ'g Co. and Sanchez v. The New Mexican to demonstrate that, under New Mexico law, non-promissory declarations and general policy statements in employee handbooks are insufficient to create implied contracts, and holding that the provisions in the handbook's provisions at issue were not sufficiently specific, explicit, or mandatory to create a reasonable expectation that the employer would provide a particular response to the plaintiff's grievance). Although the terms of the Policies and Procedures Handbook did not change J. Clark's status as an at-will employee, and Lopez has not asserted that J. Clark was anything other than an at-will employee, the Policies and Procedures Handbook may still create an implied contract between the parties on other issues, such as termination procedures, see Francis v. Mem'l Gen. Hosp., 1986-NMSC-072, 104 N.M. 698, 699, 726 P.2d 852, 853 ("This Court has recognized that a contract of employment may be implied from a personnel policy guide, and where such a policy manual exists, the employer must follow the procedures therein governing termination, even for an employee at will." (citing Forrester v. Parker, 1980-NMSC-014, 93 N.M. 781, 606 P.2d 191)), or "overtime compensation, jury and witness fees, holiday compensation and duties, and physical fitness time," Whittington v. N.M. Dep't of Pub. Safety, 2004-NMCA-124, ¶ 6.   See 2004-NMCA-124, at ¶ 15 ("[I]mplied contracts often modify the at-will employment relationship, but these same contracts may contain other terms related to the employer-employee relationship.").

- 49 -

Lopez points to the language in the Policies and Procedures Handbook which states: "Our team approach to accident prevention and safe work practices will ensure that *dm*Dickason field employees are provided a working environment that promotes safety," and that "*dm*Dickason will promote a safe and healthy work place for all of our employees."   Policies and Procedures Handbook at 3.   Regarding workplace injuries, the Policies and Procedures Handbook states that "*dm*Dickason will deal promptly with legitimate claims and workers compensation insurance will pay medical expenses and wages.   *dm*Dickason has extensive experience investigating claims and will fight fraudulent claims with all available resources."   Policies and Procedures Handbook at 3. The Policies and Procedures Handbook also makes statements regarding the harassment policy and employee benefits.   See Policies and Procedures Handbook at 1 (listing employee benefits, including insurance, vacation, and holidays); id. at 3 (stating that *dm*Dickason Personnel will "promote a productive work environment free of harassment").   The remaining provisions in the Policies and Procedures Handbook, or at least the portions provided to the Court, focus on policies and procedures that the employees are to follow, such as whom to notify for sick days, how to use the time cards, procedures for reporting harassment, safety dos and don'ts, and how to report work-related injuries.   These statements fall short of creating procedures by which the Dickason Defendants promised to abide; the statements are not definite, specific, or explicit as to what the Dickason Defendants would do regarding safety, other than to express their general policy to promote a safe workplace.   The statements do not outline a procedure that *dm*Dickason Personnel promised to follow to ensure a safe work place, such as promising regular visits to the worksites to independently identify hazards or to review the safety training provided at the worksites.   Instead, the Policies and Procedures Handbook makes a general policy statement regarding the Dickason

Defendants' general promotion of safe workplaces, without making any specific promises that would justify an employee's expectation that the Dickason Defendants would conform to any particular procedures.   The Policies and Procedures Handbook did not create an implied contract between J. Clark and the Dickason Defendants.[20]

---

[20] The parties disagree whether the Dickason Defendants would have had a duty, apart from the terms in the Policies and Procedures Handbook, to provide a safe workplace.   In Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1250 (D.N.M. 2011)(Browning, J.), the Court explained that, while an employee handbook may create an implied contract, "an alleged implied contract that merely restates the law does not create an implied contract."   776 F. Supp. 2d at 1250.   The Court reviewed cases in which other courts held that employee manuals and similar documents which made anti-harassment policy statements merely restated the employer's requirements under applicable federal and state anti-discrimination laws, and thus, did "'not create a separate and independent contractual obligation.'"   776 F. Supp. 2d at 1250 (quoting Peralta v. Cendant Corp., 123 F. Supp. 2d 65 (D. Conn. 2000)).   Generally, employers have a duty to provide a safe workplace for their employees.   See Gutierrez v. Sundancer Indian Jewelry, Inc., 1993-NMCA-156, 117 N.M. 41, 47, 868 P.2d 1266, 1272 ("New Mexico has recognized that, at common law, an employer must exercise reasonable care to provide an employee with a safe workplace."); Restatement (Second) of Agency § 492 (stating that a master is "subject to a duty that care be used either to provide working conditions which are reasonably safe for his servants . . ., or to warn them of risks of unsafe conditions which he should realize they may not discover by the exercise of due care").   Lopez argues that, because *dm*Dickason Personnel placed J. Clark at the Recycling Center and was not in charge of the worksite, it would not have had a duty to provide a safe workplace apart from assuming a contractual duty.   See Tr. at 28:9-21 (Roach). There is some support for Lopez' argument under the "special employer" or "lent employee" doctrine:

> The special employer test is a "creature of the common law."   Bendure v. Great Lakes Pipe Line Co., 199 Kan. 696, 433 P.2d 558, 563 (1967).   The test arises out of the borrowed or lent employee doctrine and applies to situations "where an employee of one employer, the general employer, works temporarily for another employer, the special employer."   Rodriguez v. Martin Landscape, 882 S.W.2d 602, 604 (Tex. Ct. App. 1994); see Rivera [v. Sagebrush Sales, Inc.], 118 N.M. at 678-79, 884 P.2d at 834-35.   The typical factual scenario in which this test arises is in cases where a labor contractor or a labor service provides temporary workers to other employers.

Hamberg v. Sandia Corp., 2007-NMCA-078, ¶ 10, 142 N.M. 72, 162 P.3d 909, aff'd, 2008-NMSC-015, 143 N.M. 601, 179 P.3d 1209.   The Restatement (Second) of Agency states: "A servant knowing that he has been lent by his master to serve another as his servant has the rights of a servant against the second master but not those of a servant against the first."   Restatement

_____

(Second) of Agency § 517.   This provision suggests that J. Clark was lent to the Recycling Center and that the Recycling Center, and not *dm*Dickason Personnel, owed J. Clark a duty to maintain a safe workplace; any negligence claims that J. Clark would have regarding an alleged unsafe workplace would be against the Recycling Center.   Am. Jur. 2d also supports this position:

> An employer's duties to an employee generally relate only to places and instrumentalities over which the employer has complete control and dominion. Therefore, when an employer sends an employee to work on the premises of a third person, the employee's remedy for any injury suffered as a result of the third party's failure to keep the premises in a reasonably safe condition is against such third party, and not against the employer, absent some agreement permitting such a remedy.

> **Observation:** However, where the employer contracts to do work on the premises of another and retains direction and control of the work, the employer is under the same duty to exercise care for the safety of its employees as is required by law regarding its own premises.

27 Am. Jur. 2d Employment Relationship § 245 (footnotes omitted).
On the other hand, Am. Jur. 2d also recognizes that, when an employee is loaned to a special employer, the employee "can become the employee of another person alternately, simultaneously, wholly, or partially," and that "[t]here may be a presumption that the general employer retains control of his or her employee."   27 Am. Jur. 2d Employment Relationship § 6. The Supreme Court of New Mexico has approved the special-employer test that the Court of Appeals of New Mexico set forth in Rivera v. Sagebrush Sales, Inc.: (i) "the employee has made a contract of hire, express or implied, with the special employer"; (ii) "the work being done is essentially that of the special employer"; and (iii) the special employer has the right to control the details of the work."   Hamberg v. Sandia Corp., 2008-NMSC-015, ¶ 11, 143 N.M. 601, 604, 179 P.3d 1209, 1212.   The third part of the test "recognizes that the general employer and the special employer may 'both exercise[] control over the employee and both benefit[] to some degree from the employee's work.'"   Hamberg v. Sandia Corp., 2008-NMSC-015, ¶ 13 (alterations in original)(quoting Restatement (Third) of Agency § 7.03 cmt. d(2)).   The comments to the Restatement (Third) of Agency provision that the Supreme Court of New Mexico cited describe the concept of "lent employees" and "borrowed servants" in more detail; the comments explain that, in the context of an employer's liability for an employee's torts, "[i]t is a question of fact whether a general or a special employer, or both, have the right to control an employee's conduct," and that "[s]ome cases allocate liability to both general and special employer on the basis that both exercised control over the employee and both benefited to some degree from the employee's work."   Restatement (Third) of Agency § 7.03 cmt. d(2).   In Hamburg v. Sandia Corp., the Supreme Court of New Mexico applied the special employer concept in the workers' compensation context.   See 2008-NMSC-015, ¶¶ 11-17.   In that case, the plaintiff was injured while working at the special employer's worksite, recovered workers' compensation benefits from the general employer, and then sued the special employer for negligence.   See 2008-NMSC-015, ¶¶ 5-6.   The Supreme Court of New Mexico held that the general employer and the special

**B.    THE NMWCA'S EXCLUSIVE-REMEDY PROVISIONS PRECLUDE LOPEZ FROM BRINGING A BREACH-OF-CONTRACT CLAIM AGAINST DICKASON.**

The NMWCA states that it "provides exclusive remedies," and that

> [n]o cause of action outside the Workers' Compensation Act shall be brought by an employee or dependent against the employee or his representative, including the insurer, guarantor or surety of any employer, for any matter relating to the

employer both exercised some control over the employee's work, and that, because the special employer complied with the NMWCA, the NMWCA's exclusive remedy provisions barred the employee's negligence claim against the special employer.  See 2008-NMSC-015, ¶ 20. Hamberg v. Sandia Corp. addressed general and special employers' liabilities to an employee in the workers' compensation context, and the provisions from the Restatement (Third) of Agency that the Supreme Court of New Mexico cited discuss the special-employer doctrine in the respondeat superior context; there may be situations in which general and special employers both owe duties to employees, including the duty to provide a safe workplace.

The Supreme Court of New Mexico has not adopted § 517 of the Restatement (Second) of Agency.  Based on its approach to the special-employer doctrine in Hamburg v. Sandia Corp., the Court doubts that the Supreme Court of New Mexico would adopt the strict position that the Restatement (Second) of Agency suggests, where the employee does not have the rights of a servant against the general employer, and instead only has the rights of a servant against the special employer.  The Court believes that, rather than adopting this Restatement (Second) of Agency approach, the Supreme Court of New Mexico would recognize some situations in which the employee would have the rights of a servant against the general employer and the special employer, and some situations in which the employee may have the rights of a servant against only the general employer or only the special employer.  The approach in specific cases would likely turn on issues of control and whether the general employer "lacked the right to control [the employee's] work."  Hamburg v. Sandia Corp., 2008-NMSC-015, ¶ 13.  While the parties have submitted evidence that J. Clark was working at the Recycling Center and under Tafoya's supervision, it is not enough to show that the special employer had the right to control J. Clark, because there may be other aspects in which the Dickason Defendants retained the right to control J. Clark.

Further, the Court could not identify any states that have cited to or relied on § 517 of the Restatement (Second) of Agency.  The Court has its doubts that the Supreme Court of New Mexico would relieve all temporary worker services of all liability.  Nevertheless, even if Lopez may be correct that the Dickason Defendants do not owe him a duty to provide a safe work place, the Court concludes that the Policies and Procedures Handbook does not create an implied contract for the Dickason Defendants to do so.  Because the Court has determined that the Policies and Procedure Handbook's statements regarding workplace safety are general policy statements, and not promises to take any particular procedures regarding safety, whether the Dickason Defendants would have owed J. Clark a duty to provide a safe workplace under the common law does not affect the Court's conclusion: the Policies and Procedures Handbook does not create an implied contract.

- 53 -

occurrence of or payment for any injury or death covered by the Workers'
Compensation Act.

N.M. Stat. Ann. § 52-1-6(E).   New Mexico has recognized at least one situation in which the

NMWCA is not the exclusive remedy -- a claim under Delgado v. Phelps Dodge Chino, Inc., when

the employer willfully or intentionally injures a worker.   See Delgado v. Phelps Dodge Chino,

Inc., 2001-NMSC-034, ¶ 1 (stating that "when an employer willfully or intentionally injures a

worker, that employer, like a worker who commits the same misconduct," loses the protection of

the NMWCA's exclusive-remedy provisions).   Lopez argues that this case presents another

situation in which the exclusive-remedy provision does not bar the claim, because, in Lopez' view,

the Dickason Defendants contracted with J. Clark to ensure J. Clark a safe working environment.

Lopez contends that the NMWCA's exclusive-remedy provisions do not foreclose a

breach-of-contract claim and relies primarily on Elrac, Inc. v. Exum, a decision from New York's

highest court.   In that case, the Court of Appeals of New York held that an employee could pursue

his contract claim against his employer, despite the exclusive language in New York's workers'

compensation statute.   See 961 N.E.2d at 645.   The employer, Elrac, Inc., which was a subsidiary

of Enterprise Rent-A-Car Company, was self-insured.   See 961 N.E.2d at 644.   A New York

statute required

> every policy of motor vehicle liability insurance to contain a provision requiring
> payment to the insured of all sums, up to $25,000 in the case of injury and $50,000
> in the case of death, that the insured is entitled to recover as damages from the
> owner or operator of an uninsured motor vehicle . . . .

961 N.E.2d at 644.   The Court of Appeals of New York said this law also applied to self-insurers.

See 961 N.E.2d at 644.   The employee brought a case against his employer to recover his

uninsured motorist benefits, a claim which the Court of Appeals of New York said was

- 54 -

"essentially contractual.   The situation is as though the employer had written an insurance policy to itself, including the statutorily-required provision for uninsured motorist coverage."   961 N.E.2d at 645.   Although the workers' compensation statute covered the employee and included an exclusive-remedy provision -- "[t]he liability of an employer [for workers' compensation benefits] . . . shall be exclusive and in place of any other liability whatsoever, to such employee . . . to recover damages, contribution or indemnity, at common law or otherwise, on account of such injury or death or liability arising therefrom," 961 N.E.2d at 644 (some alterations in original) -- the Court of Appeals of New York explained that "there are cases -- of which this is one -- in which [the words 'any other liability whatsoever'] cannot be taken literally."   961 N.E.2d at 644.

> Specifically, the statute cannot be read to bar all suits to enforce contractual liabilities.  If an employer agrees, as part of a contract with an employee, to provide life insurance or medical insurance, and breaches that contract, an action to recover damages for the breach would not be barred, though the action might literally be "on account of . . . injury or death.

961 N.E.2d at 645.   In Lopez' view, the New York case demonstrates that the NMWCA's exclusive-remedy provisions do not preclude contract claims the employee may have against the employer.   Lopez contends that, "[w]hen an employer contracts with an employee regarding safety issues, the employer should not be excused for a breach of contract by asserting exclusivity under the NMWCA.   Otherwise, the employer's contractually assumed obligations, representations and responsibilities will be unenforceable even though employee's obligations will be enforceable."   Response at 7.

The Dickason Defendants argue that Lopez' reading of the NMWCA ignores the statute's plain language; in their view, N.M. Stat. Ann. § 52-1-6 "does not limit the exclusivity provisions to tort actions . . . [but] is all inclusive, and includes actions based on contract."   Reply at 7.

They contend that, although employers may waive the exclusive-remedy provisions, such a waiver must be expressed clearly.   See Reply at 5.

The Court agrees that the Supreme Court of New Mexico would probably not preclude every breach-of-contract claim that employees could bring against their employers when the employee is entitled to workers' compensation payments.[21]   The Court does not, however, think that, simply because the claim is couched in terms of a contract rather than a tort, New Mexico

_____

[21] Federal courts must determine what a state's Supreme Court would do if confronted with the same issue.   See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).   In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."   311 U.S. at 467. "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review."   Stoner v. N.Y. Life Insurance Co., 311 U.S. at 467.   See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case."). As the Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law.   The federal court must follow the most recent decisions of the state's highest court.   Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law.   Ultimately, however, the Court's task is to predict what the state supreme court would do.   Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).   See Estate of Anderson v. Denny's, Inc., No. CIV 12-0605 JB/GBW, 2013 WL 6506319, *32 & n.16 (D.N.M. Nov. 13, 2013)(Browning, J.)(noting that the Court's task is to predict what the Supreme Court of New Mexico would do); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M. 2008)(Browning, J.)("The Court's task is to divine, as much as possible, what the Supreme Court of New Mexico would do if the legal question was presented to it.").

courts would necessarily allow the claim to proceed.   As the Dickason Defendants point out, the exclusive-remedy provisions purport to apply to all causes of action, and not just to tort claims. The Court thinks that the Supreme Court of New Mexico would permit certain breach-of-contract claims to proceed, however, if the subject matter of the claim does not duplicate the workers' compensation recovery.   In Elrac, Inc. v. Exum, the contract claim centered around the employer's duty to provide uninsured motorist coverage, which seems to the Court to be separate from the damages the employee would have been seeking had he tried to sue for the damages he sustained in the car accident.   If an employer assumes a contractual duty apart from workers' compensation, then the employer should not be able to avoid liability simply because the employee's opportunity to enforce that duty arises because of an accident at work.   On the other hand, the Court is skeptical of breach-of-contract claims based on an employer's promise to provide a safe working environment; the Court does not see how the damages that an employee would seek under the breach-of-contract theory would be any different from the damages the employee would seek for a tort action based on the injury.   Put another way, it seems to the Court as though the damages under the contract theory -- the difference between the value of the workplace as promised, i.e., safe, and the value of the workplace as provided, i.e., unsafe, -- mirror the damages for a tort claim, such as negligence, where the damages reflect the difference between the employee's life without the negligence, i.e., not injured, with the employee's life with the negligence, i.e., injured.   The damages may use different words, but convey the same idea of trying to avoid the limitations in the NMWCA.

Although New Mexico has not addressed this issue, other states have faced situations where an employee, who has a workers' compensation claim, also brings a breach-of-contract

claim against the employer for failing to provide a safe work place.   Many of these states have indicated that the exclusive-remedy provisions of the particular state's workers' compensation act precludes breach-of-contract claims based on a failure to provide a safe work place.   See, e.g., Cherry v. Tanda, Inc., 940 S.W.2d 457, 462 (Ark. 1997)(holding that exclusive-remedy provision barred the employee's suit against his employer for an alleged breach of "its implied contractual duty to supply a safe place to work"); Williams v. Munford, Inc., 683 F.2d 938, 940 (5th Cir. 1982)(holding that, under Mississippi law, a plaintiff's claim that her injuries resulted from a breach of an implied contract by her employer to provide her a safe place to work was not cognizable, reasoning that "acceptance [of this argument] would go far to circumvent the entire policy of the Mississippi compensation plan, a policy to provide scheduled compensation for job-related injuries in exchange for withdrawing all other remedies for them"); Huddleston v. Kimberly-Clark Corp., 2012 WL 1611508, 3-4 (N.D. Miss. 2002)(observing that "[p]laintiffs do not cite any Mississippi cases where a court has allowed a claim based on breach of contract by the employer to provide a safe place to work to go to trial as an exception" to the workers' compensation act's exclusive-remedy provisions); Dugger v. Miller Brewing Co., 406 S.E.2d 484, 485-86 (Ga. Ct. App. 1991)(stating that "[t]he only remedy available to an injured employee for an employer's breach of duty to provide a safe work place, are the rights and remedies provided for under the Georgia Workers' Compensation Act," holding that workers compensation barred the employee's suit against the employer for an alleged breach of its contractual duty to provide a safe work environment as set forth in the collective bargaining agreement, explaining that the collective bargaining agreement did not create an independent legal duty not already existing under Georgia law, and, thus, stating that any personal injuries must be remedied pursuant to

workers compensation); <u>Hornsby v. Southland Corp.</u>, 487 A.2d 1069, 1072 (R.I. 1985)(holding that employee who was beaten and raped while working alone at night in a 7-Eleven store could not maintain an action against her employer for failure to provide a safe place to work, based on the employer's promise to provide adequate security and lighting at the store because of its location in the city's high-crime area, by casting her action in the form of a suit for breach of contract; although the exclusive-remedy provisions preclude the claim for breach of the contractual promise to a safe work environment, the exclusive-remedy provisions may not preclude the employer's breach of contractual promises to provide employee with more benefits than provided by workers' compensation).

Although not involving a contract in which the employer promised to provide a safe work place, the Supreme Court of Arizona's discussion in <u>Stoecker v. Brush Wellman, Inc.</u>, 984 P.2d 534 (Ariz. 1999)(en banc), is helpful to explain why the exclusive-remedy provisions may bar some breach-of-contract claims, but not others. In that case, the Supreme Court of Arizona determined that the exclusive-remedy provisions did not bar the employees' action against the employer for breaching the contract in which the employer promised that, if the employees contracted chronic beryllium disease as a result of working at the plant, the employer would pay an income supplement in addition to workers' compensation so that the employees' income would be equal to what they were making before getting sick. <u>See</u> 984 P.2d at 535. The Supreme Court of Arizona explained that the exclusivity statute does not bar every action the employee may have against the employer; "[t]he claims precluded are those in which the wrong alleged *and* the damages sought are within the Act's coverage." 984 P.2d at 537 (emphasis in original). Rather than "camouflaging a tort claim as a contract claim," the Supreme Court of Arizona explained that

the employees' breach-of-contract claim was based on specific benefits the employer promised over and above what workers' compensation would provide, and, thus, the exclusivity statute did not bar the breach-of-contract claim.   See 984 P.2d at 538.   Whether the breach-of-contract claim is for the same wrong and is seeking the same damages as what workers' compensation insurance covers may explain why the Court of Appeals of New York in Elrac, Inc. v. Exum similarly permitted a contract claim, based on uninsured motorist benefits, to proceed, while other courts have held that the exclusive-remedy provisions preclude breach-of-contract claims for the failure to provide a safe work place.

Michigan courts have also criticized breach-of-contract claims that are disguised tort claims, but Michigan courts have stated in dicta that whether the worker's compensation act precludes a breach-of-contract claim for the employer's failure to provide a safe work environment depends on whether the contract terms are express or implied, as the exclusive-remedy provisions would presumably only bar the latter.   In Beauchamp v. Dow Chem. Co., 398 N.W.2d 882 (Mich. 1986), a research chemist applied for workers' compensation benefits based on his exposure to certain chemicals, which he alleged impaired his normal bodily functions.   See 398 N.W.2d at 883.   The chemist also sued Dow Chemical for, among other claims, breaching its contract to provide safe working conditions.   See 398 N.W.2d at 883.   The Supreme Court of Michigan held that the exclusive-remedy provisions of the workers' compensation act barred the breach-of-contract claim.   See 398 N.W.2d at 884.

> A claim that an injury is caused by failure to provide safe working conditions is essentially a recasting in contract form of a claim that the employee was injured by the employer's negligence.   It is not even a recasting in contract form of an intentional tort.   The workers' compensation act provides a quid pro quo for accidental injury.   Limited but certain compensation for accidental injuries caused by unsafe working conditions has been substituted for the right to sue for accidental

> injuries caused by unsafe working conditions.   Allowing a civil action as well as compensation for an injury caused by failure to provide safe working conditions would alter the balance struck by the legislation.

398 N.W.2d at 894.   The Supreme Court of Michigan concluded that "[a]n allegation that an injury resulted from an employer's failure to provide safe working conditions is exactly what is covered by the workers' compensation act"; that the breach-of-contract claim was "essentially a claim that the employee was injured by the employer's negligence"; and, thus, that the exclusive-remedy provisions barred the action "even though the plaintiff casts his action in the form of a breach of some kind of contract."   398 N.W.2d at 894.

Less than two years after the Supreme Court of Michigan decided Beauchamp v. Dow Chem. Co., the Court of Appeals of Michigan differentiated between implied and express contract terms, and said that it did not "believe the Supreme Court intended the exclusive-remedy provision to bar those claims where the employer expressly promises to provide safe working conditions." Benson v. Dep't of Mgmt. & Budget, 424 N.W.2d 40, 42 (Mich. Ct. App. 1988).   The Court of Appeals of Michigan explained: "[W]e interpret Beauchamp as holding that where the alleged contract breach is for failure to provide safe working conditions, the employer must have assumed that duty expressly; a claim for breach of contract will not avoid the exclusive-remedy provision where the contract was merely implied in law or fact."   Benson v. Dep't of Mgmt. & Budget, 424 N.W.2d at 42.   In that case, the employee injured her left leg and ankle when she slipped and fell in the parking lot where she worked, and alleged that her employer breached its contract to maintain the parking lot in a safe condition.   See 424 N.W.2d at 41.  Because the Court of Appeals determined that it was "beyond dispute that defendant did not expressly agree to clear the [parking lot] of snow and ice, specifically, or maintain the lot in a safe condition, generally," and

because the employee did not present any proof that the employer "expressly agreed to undertake the obligation," the Court of Appeals of Michigan held that the exclusive-remedy provision barred the breach-of-contract claim.   See 424 N.W.2d at 42-43.   Similarly, in Schefsky v. Evening News Ass'n, 425 N.W.2d 768 (Mich. Ct. App. 1988), the employees, who were injured after inhaling toxic chemical fumes while cleaning printing presses, alleged that their employer breached its contract to provide safe working conditions.   See 425 N.W.2d at 769-70.   The Court of Appeals of Michigan reiterated the dicta from Benson v. Department of Management & Budget -- that "a claim based on the breach of an *express* contract to provide safe working conditions may survive a challenge based on the exclusive remedy provision," 425 N.W.2d at 772 (emphasis in original) -- but again held that the exclusive-remedy provisions barred the employees' breach-of-contract claims, because the employees "have not alleged that [the employer] expressly promised specifically to safeguard plaintiff[s] from the inhalation of chemical fumes which could cause asthma or any other serious or permanent respiratory disease or injury or promised generally to provide plaintiff[s] with safe working conditions."   425 N.W.2d at 772.

The Court of Appeals of Michigan articulated this rule again in Hesse v. Ashland Oil Inc., No. 209075, 2001 WL 789193 (Mich. Ct. App. Jan. 12, 2001), rev'd in part on other grounds, 642 N.W.2d 330 (2002).   In that case, a high school student took part in a work study program with an automotive service center; as part of the program, the student, the school counselor, and the store manager signed a work study plan, and the service center's manager completed a work permit for the student's employment.   See 2001 WL 789193, at *1.   The student died in an accident at the service center after another student had unknowingly accepted gasoline, rather than used motor oil, for the service center's oil recycling program, and then used a lighter to check the level in the

storage tank, which caused an explosion and fire.   See 2001 WL 789193, at *1.   The plaintiff --

the student's personal representative -- brought a breach-of-contract claim against the service

center.   See 2001 WL 789193, at *1.   The Court of Appeals of Michigan explained:

> Generally, a claim that an employer breached a contractual promise to provide safe working conditions merely amounts to a claim of negligence, which is barred by the exclusive remedy provision [of Michigan's Workers' Disability Compensation Act, Mich. Comp. Laws § 418.131].   Schefsky v. Evening News Ass'n, 169 Mich. App. 223, 229-230; 425 N.W.2d 768 (1988).   However, a claim based on the breach of an express contract to provide safe working conditions may survive a challenge based on the exclusive remedy provision.   Id. at 230-231.

2001 WL 789193, at *5.   The Court of Appeals of Michigan explained that, "[b]ecause plaintiffs'

contract claim is premised on defendant's breach of an alleged express contract to provide safe

working conditions to Jason, this claim is not barred," 2001 WL 789193, at *5, but went on to

grant the defendant's motion for summary judgment, because it determined that neither the work

study plan nor the work permit constituted a valid contract between the parties, see 2001 WL

789193, at *7.

     Michigan courts treat implied contractual terms related to workplace safety and express

contractual terms differently; they view the former as a disguised negligence claim, and have held

that the exclusive remedy provisions of Michigan's workers' compensation act bar such a claim,

but have left open the possibility for permitting a breach-of-contract claim based on an express

contract term related to workplace safety.   That distinction seems to be based on a desire to

uphold the balance that the legislature struck in passing a workers' compensation act with

exclusive remedy provisions.   When an employer voluntarily takes on a specific, express promise

regarding workplace safety, however, the Michigan courts have indicated that the exclusive

remedy provisions would not bar the breach-of-contract claim, because the employer should be

held to that promise.  For example, in <u>Schefsky v. Evening News Association</u>, the Court of Appeals of Michigan noted that, had the employer "expressly promised specifically to safeguard plaintiff from the inhalation of chemical fumes which could cause asthma or any other serious or permanent respiratory disease or injury or promised generally to provide plaintiff with safe working conditions," it might have permitted the breach-of-contract claim to survive summary judgment.  425 N.W.2d at 772.

The Supreme Court of New Mexico has similarly expressed a desire to uphold the balance that the Legislature struck in passing the NMWCA, without favoring employer or employee:

> [The] purpose of the Workers' Compensation Act (WCA) is to provide "quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers who are subject to [its] provisions." NMSA 1978, § 52-5-1 (1990).  The WCA is a delicate balance between the rights and interests of the worker and the employer.  <u>See id.</u>  Thus, "any judicial analysis under the [WCA] must balance equally the interests of the worker and the employer without showing bias or favoritism toward either."  <u>Salazar v. Torres</u>, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449.

<u>Gonzalez v. Performance Painting, Inc.</u>, 2013-NMSC-021, 303 P.3d 802, 804.  The Court concludes that the Supreme Court of New Mexico may follow Michigan's approach, precluding breach-of-contract claims based on implied contract provisions but permitting breach-of-contract claims based on express contract provisions.  While there is some language in the Michigan opinions regarding the general promise to provide a safe workplace, <u>see</u> <u>Schefsky v. Evening News Association</u>, 425 N.W.2d at 772 (noting that the employee did not allege that the employer "promised generally to provide plaintiff with safe working conditions"), the Court concludes that, even under Michigan law, the contract term must do more than re-state the employer's requirements under the common law or under the workers' compensation scheme if the term arises

in an implied contract.   Rather, to maintain a breach-of-contract claim, the employer's promise must be specific as to what it is promising over and above the general promises to provide a safe work place.   In Schefsky v. Evening News Association, the Court of Appeals of Michigan said that the employer could have "expressly promised specifically to safeguard plaintiff from the inhalation of chemical fumes which could cause asthma or any other serious or permanent respiratory disease or injury."   425 N.W.2d at 772.   This suggests that the Michigan courts may require more than general safety policies; after all, the Court could not find any cases in which Michigan courts have found an express contract based on general policies.   Here, the Dickason Defendants could have promised to visit the workplace locations on a weekly or monthly basis to ensure that the Recycling Center was using safe business practices, or promised that any machines at job locations would have safety controls to prevent the machines from engaging while an employee was inside.   The Dickason Defendants did not make any specific promises, however; the statements in the Policies and Procedures Handbook instead were general policy statements, and even if generally promising a safe workplace, did not go beyond what the law already requires.   Requiring the contract provisions to be express and specific protects employers from the threat of disguised tort claims, based on nothing more than an implied contract term, but also protects employees who may have been counting on the employer's express and specific promises.   In this case, the Policies and Procedures Handbook made general policy statements regarding safety; those statements failed to rise to the level of an implied contract, but even if they had, the NMWCA's exclusive-remedy provisions would bar the claim, because it is a disguised tort claim.

The Court also does not think that the Policies and Procedures Handbook expressly waives the Dickason Defendants' exclusive remedy protections.   The parties disagree whether City of

Artesia v. Carter applies in this case; in City of Artesia v. Carter, the Court of Appeals of New Mexico stated that an employer may voluntarily relinquish his statutory protection, because it is consistent with the right to contract.   See 94 N.M. at 313-14, 610 P.2d at 200-01.   The employer had contracted with a third party -- the City of Artesia -- and agreed to indemnify the City from any suits against it.   See 94 N.M. at 311-12, 610 P.2d at 198-99.   After the employee died on the job, the employer paid workman's compensation to the employee's widow, but she sued the City as well for wrongful death.   See 94 N.M. at 312, 610 P.2d at 199.   The case settled, and the City and the City's insurance sued the employer to recover the costs incurred in the wrongful death suit. See 94 N.M. at 312, 610 P.2d at 199.   The Court of Appeals of New Mexico explained that the NMWCA's exclusive-remedy provisions did not bar such a claim, in part because the employer can contract with third parties to distribute loss.   See 94 N.M. at 313-14, 610 P.2d at 200-01.

Unlike City of Artesia v. Carter, viewing the Policies and Procedures Handbook as an implied contract would change the liability that the employer, *dm*Dickason Personnel, owes to its employees, and not just to third parties with which it contracts.   The Policies and Procedures Handbook does not clearly express that *dm*Dickason Personnel is waiving its statutory protections, and reading that waiver into the Policies and Procedures Handbook would change the Dickason Defendants' liability without much basis.   Instead, the Policies and Procedures Handbook affirms that employees have worker's compensation insurance, and that, if injured on the job, "*dm*Dickason will deal promptly with legitimate claims and worker's compensation insurance will pay medical expenses and wages."   Policies and Procedures Handbook at 3.   These statements, which are in the section entitled "Safety Policy Procedures," demonstrate that employees injured on the job could rely on the workers' compensation insurance to cover legitimate claims, and there

is no mention of Dickason waiving the exclusive-remedy provisions.   The Court of Appeals of New Mexico in <u>City of Artesia v. Carter</u> said that businesses should have certainty in their legal relationships based on contracts that they voluntarily assume; viewing the Policies and Procedures Handbook as an implied contract that waives the exclusive-remedy provisions does not add certainty, because the waiver is not express -- it removes certainty that employers would otherwise have regarding injuries and deaths that occur at the workplace.

The Court concludes that the Supreme Court of New Mexico would not permit the breach-of-contract claim in this case proceed, because the Dickason Defendants have not waived their protection under the NMWCA's exclusive-remedy provisions, and because the breach-of-contract claim premised on the failure to provide a safe workplace duplicates the damages that the NMWCA is designed to limit.   The Court will grant the MSJ and dismiss Lopez' breach-of-contract claim against the Dickason Defendants.

**IT IS ORDERED** that the request for summary judgment in the Defendants Don Dickason, Martha Dickason and dmDickason Personnel Services' Motion for Summary Judgment and Memorandum in Support Thereof, filed August 28, 2013 (Doc. 80), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Janet Santillanes
Janet Santillanes, P.C.
Albuquerque, New Mexico

--and--

- 67 -

James K. Gilman
Albuquerque, New Mexico

--and--

James T. Roach
Law Offices of James T. Roach
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Craig T. Erickson
Joshua A. Allison
Sheehan & Sheehan, P.A.
Albuquerque, New Mexico

--and--

Eric W. Matzke
Michael Gonring
Raymond Jamieson
Quarles & Brady LLP
Milwaukee, Wisconsin

    *Attorneys for Defendants American Baler Company, Metso Corporation, Metso*
        *Lindemann, and Defendant/Third-Party Plaintiff Lindemann Recycling Equipment, Inc.*

Paul Maestas
Maestas & Suggett, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants Don Dickason and Martha Dickason*

Damian L. Martinez
Casey B. Fitch
Holt Mynatt Martinez, P.C.
Las Cruces, New Mexico

    *Attorneys for Third-Party Defendant City of Las Cruces*